(No. 83783.)

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. WILLIAM PEEPLES, Appellant.

*Opinion filed June 20, 2002.—Rehearing denied August 29, 2002.*

HARRISON, C.J., and KILBRIDE, J., dissenting.

Marshall J. Hartman and Martin S. Carlson, of the Office of the State Appellate Defender, of Chicago, and Anne E. Carlson, of Northbrook, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, James E. Fitzgerald and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122—1 et seq. (West 1994)), defendant, William Peeples, petitioned the circuit court of Cook County for post-conviction relief. The circuit court dismissed defendant's amended post-conviction petition without conducting an evidentiary hearing. Because defendant was sentenced to death for the underlying murder conviction, he appeals directly to this court. 134 Ill. 2d R. 651(a). For the reasons that follow, we affirm the judgment of the circuit court.

## BACKGROUND

This court has previously detailed the evidence

presented at defendant's trial in our opinion on direct appeal. *People v. Peeples*, 155 Ill. 2d 422 (1993). Therefore, we state here only those facts which are necessary to the disposition of this appeal.

On May 18, 1988, defendant was arrested for the murder of Dawn Dudovic, who was discovered stabbed to death in her Schaumburg apartment earlier that day. Defendant and his fiancée, Vanessa Allen, lived in an apartment next door to the victim's apartment.

During the early evening hours of May 18, Pamela Killeen, the victim's roommate, returned home and observed the victim's car in the parking lot. Upon arriving at the front door of unit 102, the apartment she shared with the victim, Killeen discovered a red-stained piece of paper towel wedged in the door which prevented the door from locking. Killeen removed the paper towel and entered the apartment. She then noticed red stains on the walls and carpeting leading to the kitchen, and discovered the victim lying on her back on the kitchen floor. In an immediate attempt to seek help, Killeen pounded on the front door of unit 101, defendant's apartment. Killeen testified that she continued to knock and scream at the door of unit 101 for about a minute because she had heard sounds inside that apartment. However, when there was no response, she sought and received help from another neighbor, Kenneth Evenson. Evenson accompanied Killeen to her apartment, observed the victim lying in a pool of blood on the kitchen floor, and returned to his apartment to call the paramedics. Shortly thereafter, the paramedics arrived and pronounced the victim dead.

At approximately 6 p.m., members of the Schaumburg police department began arriving at the apartment complex and initiated a canvas of the building. When the officers knocked on the door of unit 101, they received no response. However, the officers noticed that shadows ap-

peared and disappeared through the apartment's peephole, indicating that an individual was present inside. The officers contacted the building's manager and were told that Vanessa Allen was the tenant of record for unit 101. When the officers telephoned Allen at work, she informed police that she lived in the apartment alone. Based on this information, the officers concluded that no one should have been in the apartment.

At approximately 7:40 p.m., the police had not yet gained entry into unit 101. At that time, the officers observed smoke coming from underneath unit 101's front door. When an officer went to the rear of the apartment and tried to look into the bedroom through a separation in the window curtains, the curtains suddenly went up in flames. The officer, who then had an unobstructed view of the bedroom, observed two fires burning in that room. In addition, it appeared that at least three other fires were burning in the living room. Shortly thereafter, Schaumburg firefighters arrived at the scene and broke out the bedroom window of unit 101. The firefighters then extended a fire hose into the apartment and attempted to extinguish the blaze. At that point, defendant appeared inside the apartment and exited through the shattered bedroom window. Defendant was arrested and transported by police to a local hospital, where medical personnel tended to a deep laceration on his left hand that had cut through the tendons of three fingers and which was bleeding profusely. Defendant also had a second cut at the web part of his left hand.

Pursuant to a search warrant, police officers searched defendant's apartment and discovered evidence of six separate fires in the living room and six separate fires in the bedroom. Each fire had been started by igniting small piles of items. Recovered from one of these piles was a wallet that contained defendant's driver's license, as well as a large kitchen knife with a bloodstained wooden

handle. Investigators also discovered a satchel in the living room, which contained a coffee cup. Examination of this cup revealed that it contained sugar and was spattered with blood.

During this time, the police also continued their investigation at the victim's apartment. An evidence technician collected blood samples from the kitchen and other areas of the victim's apartment. At trial, an expert in serology testified that the blood samples taken from several locations in the victim's apartment were of type A, which was defendant's blood type. The serologist further testified at trial that blood discovered on defendant's wristwatch and on the knife recovered from his apartment was determined to be type AB, the blood type of the victim. Testimony was also adduced that two piles of a white substance were discovered on the floor of the victim's apartment, one near the front door and one near the kitchen doorway. This substance was later confirmed to be sugar.

An autopsy performed on the victim revealed that she had suffered 23 stab wounds and 16 incised wounds. The victim also exhibited several defense wounds to her hands and arms. According to the medical examiner, the victim died as a result of multiple stab wounds, three of which pierced her lung, liver and heart. The medical examiner further testified that the wounds inflicted upon the victim could have been made by the knife recovered from defendant's apartment, although they could not be tied with certainty to any particular weapon.

Defendant testified on his own behalf. According to defendant, on the morning of May 18, 1988, he did not go to work because he was ill, took over-the-counter medication, and slept most of the day. Defendant stated that at approximately 4 p.m. he removed a package of frozen pork chops from the freezer and attempted to pry the pork chops apart with a sharp kitchen knife. Defen-

dant, who is left handed, held the package of pork chops in his left hand and held the knife in his right hand as he tried to pry the meat apart. Defendant stated that the knife slipped, and he suffered a minor cut to his left hand. Defendant testified that when he made a second attempt to separate the pork chops, the knife slipped again and caused a deep bloody wound to his left hand. According to defendant, he wrapped his hand to control the bleeding, took pain relievers, lay down, and fell asleep.

Defendant testified that he was awakened from his sleep by his telephone ringing and by pounding on his front door. Defendant stated that he looked through the peephole, saw police, and did not respond because he did not want the building management to discover that he had been living in the apartment, which was registered only in Allen's name. Defendant denied that he had set the fires in his apartment, and asserted that the police broke into his apartment and set the fires in an effort to force him out. Defendant also denied placing the knife in one of the piles of burning clothes, and contended that police placed the knife and wallet in the pile because he was the most convenient suspect and also because of "the prejudice in the northwest suburbs."

During cross-examination, the State confronted defendant with a photograph of an unopened package of pork chops lying on the kitchen counter in defendant's apartment. The State then introduced the unopened package into evidence. In addition, defendant had no explanation for the fact that the kitchen knife handle appeared to be covered with blood when, according to his testimony, only the blade of the knife had cut his hand.

On March 7, 1990, at the close of evidence and after argument, the jury returned verdicts finding defendant guilty of first degree murder, aggravated arson, home invasion and armed violence. On April 9, 1990, pursuant to defendant's pre-trial waiver of a sentencing jury, the

first phase of defendant's sentencing hearing was conducted. The trial judge found that defendant was eligible for the death penalty under section 9—1 of the Criminal Code of 1961 (720 ILCS 5/9—1(b)(6) (West 1994)) in that he was over 18 years of age at the time of the offenses and that he had committed first degree murder in the course of a home invasion.

Immediately following the circuit court's finding of eligibility, the State indicated that it was prepared to proceed to the second phase of the death penalty hearing. Defense counsel requested a continuance, stating that "there are certain aspects of the mitigation we were [sic] still working on," and that there were some mitigation witnesses that their "investigator was trying to locate." Defense counsel's request for a continuance, however, was principally based upon their discovery that defendant had suffered from spinal meningitis as a youth, which "may have affected his brain," and that shortly before the offenses defendant was in a car accident where he lost consciousness. Counsel therefore requested additional time to "do a complete neurological workup on [defendant] for the brain to see if, just how his brain is." Counsel stated that they had engaged in discussions with Dr. Rosenwald, a psychologist, who believed that "it might be appropriate to do the testing."

When the court commented that defense counsel had four weeks since the time of defendant's conviction to prepare a mitigation case, counsel responded that they had been diligent and that they "resist[ed] any suggestion that we have not been preparing for this." Counsel stated that they had engaged in conversations with defendant, and that they had interviewed several mitigation witnesses, and that these interviews had provided additional names of potential witnesses with whom they had been in contact. Counsel stated that they had "already talked to and interviewed" several witnesses

who were present in court. However, although they had been "working very hard at this," counsel stated that "there are some matters that inevitably arise in the last few days before such a hearing, and those are what you are hearing about now." The court denied defense counsel's motion for a continuance, and the second phase of defendant's sentencing hearing began.

In aggravation, the State presented evidence of three prior convictions of defendant. First, the State introduced a certified statement of conviction showing that on July 12, 1983, defendant had entered a guilty plea to attempted rape and residential burglary and had been sentenced to four years' imprisonment. In connection with this conviction, the State presented the testimony of the victim, Lisa Mowery, who was 13 years old and had been baby-sitting for her three-year-old sister at the time of the offenses. Mowery testified that defendant had knocked at the front door of their home in Schaumburg, stated that his car had broken down, and asked if he could use the telephone to summon help. Mowery let defendant into the house, defendant made a telephone call, and asked Mowery if he could wait in the house until his ride arrived. Mowery testified that defendant then grabbed her around the neck, held a knife to her ribs, forced her upstairs to the bedroom, and instructed her to remove her clothing. When Mowery refused, defendant threatened to kill her and began to cut off articles of her clothing with his knife. Defendant became angry, started hitting her with his fists, and broke her nose. Defendant then ran out of the house.

Second, the State introduced a certified copy of conviction showing that in February 1985, defendant pled guilty to the charge of misdemeanor battery and was sentenced to 90 days' incarceration. Des Plaines police officer Carol Daugherty testified that on November 13, 1984, she observed defendant running down the

street carrying a knife while an unarmed man was chasing him. Officer Daugherty stated that the unarmed man had sustained a deep laceration to his back. The State also presented evidence that, at the time of this incident, defendant was on mandatory supervised release. As a result of this incident, defendant's release was revoked, and he was returned to the penitentiary.

Finally, the State introduced a certified copy of conviction showing that defendant had been convicted of misdemeanor theft in March 1988.

Counsel for defendant presented an opening statement in which counsel requested that the court "exercise mercy," and that "defendant's love of family, his caring for his family" and his "good character" would be presented in mitigation. Counsel explained that the evidence in mitigation would show that while defendant was growing up, he "had no father figure, no role model to look up to, but despite that fact, despite the fact that he had no role model, he had the strength and inner goodness to become what we consider a good son, a good brother, a good uncle, and a father figure to his sister."

Defendant's case in mitigation consisted of the testimony of six witnesses on his behalf. In addition, two letters in support of defendant were admitted into evidence. The first witness to testify for defendant was Rev. William Frestoe, the pastor of a Chicago church, a former police officer, and the chaplain at the Cook County Department of Corrections. Rev. Frestoe testified that defendant and his family had been longtime members of his church and that he had known defendant since defendant was a very small child. According to Rev. Frestoe, defendant regularly attended church services and Sunday school and was active in the youth work of the church. Rev. Frestoe stated that, in his view, defendant was a "young man that seem[ed] to be very concerned about his education." Rev. Frestoe also related

that defendant provided a great amount of help and support to defendant's ill mother, with whom defendant was very close. Defendant cooked and cleaned for his mother and cared for her needs. Rev. Frestoe testified that defendant was very concerned about his mother's well-being.

Defendant's grandmother, Helen Shannon, was the next witness to testify on defendant's behalf. Shannon stated that because defendant's mother worked, defendant had lived with Shannon on and off from 1964 until 1978. According to Shannon, defendant "was a very obedient child," and he "never got in any trouble in school *** [or] around the neighborhood." When Shannon became ill, defendant helped her by preparing her meals, going to the store for her medicine, cleaning her house, and staying overnight to assure her well-being. Shannon testified that defendant never complained about doing these things for her. When asked on cross-examination whether she was aware that defendant had been expelled from high school for being in trouble, she replied in the negative.

The next witness to testify in mitigation for defendant was Robin McMath. McMath stated that she met defendant in 1984 at the National Education Center for Paramedics and that she and defendant had become good friends. McMath testified that when both of her parents were diagnosed with severe and disabling health problems, defendant gave her support and counseled her in an effort to help her handle the stress. McMath also stated that when she informed defendant that she missed her brother who was away in the Air Force, defendant told her not to worry because defendant would act as her "big brother." McMath stated that she would talk with defendant every day about "everything" and that they were very close. According to McMath, she conferred with defendant before she got married, and after she was

married defendant baby-sat for her child and was always there for her when she needed help.

Defendant's cousin, Wayne Greer, was the next witness called to testify on defendant's behalf. Greer stated that defendant was like a "brother" to him, and described defendant as an "all-around good person." When asked what defendant's life meant to him, Greer responded "pretty much everything." Greer recounted incidents from his childhood when he and defendant would do things together and when defendant would break up fights. Greer also stated that defendant counseled him on handling a situation with Greer's brother, even though defendant was in jail at the time. Greer testified that he did not want defendant to die and that defendant was "not worthy of death."

The next witness to testify on defendant's behalf was defendant's mother, Charlyne McCallister. She testified that she was 16 years old at the time of defendant's birth and that defendant's father, her first husband, was "very immature" and "wasn't ready to be a husband, let alone a father." McCallister stated that, over time, her relationship with defendant's father changed for the worse, as "he became involved with smoking marijuana, drinking, just running the streets *** he was in all kinds of trouble." She left defendant's father when defendant was six months old, and she was forced to go to work. However, she had difficulty remaining employed because she had severe asthma and other health problems. When defendant was three years old, she married Thomas McCallister, who was a recovering alcoholic. However, when she became pregnant with defendant's half-sister Kimberly, her health problems worsened and her husband began drinking.

McCallister testified that when defendant was four years of age, he contracted spinal meningitis and was hospitalized for about six months. She visited him every

day in the hospital, and when he was released from the hospital they became "much closer." As a child, defendant was "very small for his age," and he was "picked on because he was so small." McCallister recalled one incident when she was telephoned by defendant's school because defendant was "clowning around" in his class. Her husband went to the school and beat defendant in front of his classmates as punishment for his misbehavior.

When defendant was six or seven years old, defendant's father came back into his life, and defendant stayed with him on weekends, during spring break, and for a few weeks in the summer. McCallister testified that during these stays defendant would call her, crying, stating that his father had left him with whichever lady friend his father was seeing at the time and that defendant did not know where his father was. McCallister stated that defendant's father physically abused women in defendant's presence, and that defendant's father drank heavily. McCallister also testified that on one occasion defendant was in a hit-and-run accident with his father and defendant hit his head on the car's dashboard.

McCallister stated that when defendant was 11, she married her third husband, James Green. According to McCallister, Green physically abused her and sexually abused her daughter Kimberly when Kimberly was four. Kimberly confided to defendant that she had been molested, and defendant made Kimberly sleep in his room, barricading the door so that no one could gain entry. McCallister stated that her marriage to Green was annulled because he was still married to his previous wife.

In 1980, McCallister moved her family into a Chicago housing project, where the conditions were "horrendous." McCallister explained that the "gang and violence situation was just horrible." The family lived there about

eight months before moving to Schaumburg. At the time the family moved, McCallister was confined to a wheelchair and suffered from numerous serious health problems, including multiple sclerosis. Defendant, who was then 17 years old, took care of McCallister and the family by cleaning the house, washing clothes, preparing meals, and taking her to the hospital when she was ill. McCallister stated that defendant went to a part-time job every day, contributed his paycheck to the household expenses, and spent all of his time with the family. According to McCallister, defendant also acted as a father figure to his sister Kimberly, in that he watched over her, took her to different places, and spent time helping her with her homework and cleaning her room. McCallister further stated that in December 1987, defendant was hit by a car in front of her house and was knocked into the air. As a result, defendant suffered a broken leg and was rendered unconscious. McCallister concluded her testimony by relating that even though defendant was in jail, he called her every day, and has helped to mediate arguments between herself and Kimberly.

Defendant's sister, Kimberly McCallister, was the final witness to testify on defendant's behalf. Kimberly stated that when the family moved to Schaumburg, she had great difficulty with her schoolwork, and that defendant spent several hours with her every day to help her understand her studies and to inspire her when she became frustrated. Kimberly stated that defendant taught her how to swim, that they listened to music together, and that he often took her and her friends to the movies. Kimberly testified that defendant took care of their mother when she became severely ill, and that defendant "basically finished raising me." Defendant took care of the family by going grocery shopping, paying the bills, doing the laundry, and cooking the meals. According to Kimberly, defendant taught her to "love everybody and everything."

Kimberly further testified that when she was a teenager, she became pregnant and was frightened to tell her mother. Kimberly confided in defendant, who gave her comfort and support. Defendant advised Kimberly both against obtaining an abortion and giving the child away for adoption, and told her that he would take the baby if she did not want it. When Kimberly's daughter was born, defendant loved the baby and bought her clothes, toys, and candy. As the child grew older, defendant took the child to different places and baby-sat for her while Kimberly went to college.

According to Kimberly, even after defendant moved out of the family home, he visited her and her mother every day and spent time with Kimberly's daughter. Kimberly recounted that on one occasion when her daughter became very sick, defendant immediately drove them to the hospital. Kimberly stated that defendant is her daughter's "world" and that "[h]e's everything to her." Kimberly testified that defendant is "everything to me" and that "[w]hen I needed him, he was always there, no matter what."

Also received in evidence during the mitigation portion of the hearing was a letter written by defendant's fiancée, Vanessa Allen. Allen stated that she had known defendant for 20 months and that he was "kind, loving, generous, and would go out of his way to help people." A second letter received in evidence was submitted by Vanessa's mother, Bernice Allen, who stated that defendant was a respectable young man.

After the evidence in aggravation and mitigation was presented, both sides gave closing arguments. In their closing argument, defense counsel again asked that the court show mercy to defendant. Counsel suggested that defendant's criminal history was "not significant" and "borderline at best." Counsel argued that the evidence showed that "[t]here are forces that helped shape [defendant], slow, persistent, continuous powerful

forces." Counsel noted that the evidence established that defendant "had no father figure" and that the men in his life "were alcoholics." Counsel argued that although "[e]very child, everyone needs a role model," defendant felt "abandoned" and that this "sense of abandonment" was a "force creating and controlling [defendant]."

Counsel argued that "another force" forming defendant was the sexual abuse suffered by his sister Kimberly. Counsel noted that defendant was still a child himself when he tried to protect his sister, and that he resorted to "building up a barricade." Counsel also noted that due to defendant's small stature when he was young, he was constantly picked on, and this was "another force working on him." Counsel also noted that defendant was demeaned in school and that his stepfather had once beat him in front of the whole class. Counsel described these incidents as more "slow, persistent powerful forces that are forming him."

Defense counsel argued that they brought these "forces" to the attention of the court to show that "there are two William Peeples," the "William Peeples that family and friends knew and the William Peeples that the jury convicted him of," and "maybe these forces had something to do with it, *** can explain the differences." Defense counsel then stated: "Because what you heard in mitigation, this is not the person who would do something like this, your Honor. The jury found him guilty, but there's no question of that, but that's not the same person you heard his mother testify about, that's not the same person his sister testified about or his friends. It's a different person. He was convicted of a terrible crime, but he is not an evil person deserving to die." Counsel then asked the court "to consider the totality of William Peeples, not just the crime that he was convicted of." After recounting the testimony in mitigation, counsel asked, "Are these the actions of an evil

man needing to be put to death? No, your honor, I suggest these are mitigating factors, not reasons to put him to death."

Defendant then spoke in allocution. Defendant informed the court that "I will not beg you for mercy for a crime that I did not commit," and stated that "I have nothing to feel remorseful about." Defendant also stated that "I love my family and my friends and I tried to love my fellow human beings."

At the conclusion of evidence and argument, the trial court sentenced defendant. With respect to defendant's three prior convictions, two of which involved the use of a knife, the court concluded that "[c]ontrary to what the defense says, I believe that these crimes are significant, and it is a significant history of prior criminal activity." The trial court judge then noted the evidence presented in mitigation, including "the good that defendant did in his lifetime," the "charitable acts that he performed," and the "love that was exhibited between him and his family members to each other." The trial court judge stated that although he had no doubt that defendant had committed the crimes of which he was convicted, "the doubt that exists in my mind right now is whether the William Peeples that we heard about from the testimony of the witnesses today ever existed. The doubt that I have in my mind today is not whether William Peeples was a good boy while he attended church *** but what became of him in the meantime, because the William Peeples who committed the crime that I heard testimony to throughout three weeks of trial is not the William Peeples that was testified about today." The trial court judge concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, the circuit court sentenced defendant to death on the first degree murder conviction. The court also sentenced defendant to concurrent 30-year prison

terms on the aggravated arson and home invasion convictions. Defendant's convictions and sentences were affirmed on direct appeal by this court. *People v. Peeples*, 155 Ill. 2d 422 (1993).

On July 18, 1994, defendant, through post-conviction counsel, filed a petition for post-conviction relief, alleging that defendant's constitutional rights were violated during his trial and on direct appeal. On August 24, 1994, the State filed a motion to dismiss defendant's post-conviction petition. Thereafter, post-conviction counsel was granted leave to file an amended petition for post-conviction relief. The amended post-conviction petition, which was filed on October 31, 1994, raised eight claims for post-conviction relief. We set forth only those claims which are raised by defendant in this appeal.

First, the amended post-conviction petition alleged that defendant's due process right to be present at all critical stages of trial under the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) was violated when, during the selection of his jury, defendant was excluded from the in-chambers *voir dire* of 15 prospective jurors, three of whom ultimately served on the jury which convicted him. Within the context of this claim, the amended petition further alleged a subclaim that defendant's right to effective assistance of appellate counsel under the sixth and fourteenth amendments of the United States Constitution (U.S. Const., amends. VI, XIV) was violated when his appellate counsel failed to raise on direct appeal the issue of defendant's absence from the in-chambers questioning of prospective jurors.

Second, the amended post-conviction petition alleged that defendant's right to a fundamentally fair trial guaranteed by the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV) was violated as a result of the "extraordinary

security measures" employed during those portions of defendant's trial when the jury was present. According to the amended petition, throughout defendant's trial, two uniformed deputy sheriffs were stationed behind him. In addition, the amended petition alleged that when defendant testified in his own behalf, another uniformed deputy sheriff escorted defendant to the witness stand, stood behind defendant as he testified, and then escorted him back to the defense table in the presence of the jury. The amended petition further alleged that trial counsel's failure to object to these "prejudicial security measures" deprived defendant of his sixth and fourteenth amendment rights to effective assistance of counsel. U.S. Const., amends. VI, XIV.

In addition, the amended post-conviction petition set forth a claim that defendant was "denied his right to effective assistance of trial counsel" under the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV) and listed specific instances of these alleged violations in several subparagraphs. In the first subparagraph, the amended petition alleged that defendant's trial counsel were ineffective because they failed to make a timely motion for the preservation and independent testing of blood samples in the possession of the State, and that such testing had the "potential to exonerate [defendant] completely." Another subparagraph of this claim alleged that trial counsel had ineffectively failed to present evidence that latent fingerprints found at the murder scene could not be identified as belonging to any known individual, including defendant. According to the amended petition, had the jury been presented with this information, the jurors "could have reasonably concluded that the unidentified fingerprints found at the crime scene were left there by the offender and that the offender was therefore not [defendant]."

Finally, another subparagraph of the ineffective assistance of counsel claim incorporated by reference the allegations previously made in the amended petition that the security measures employed during the jury portion of defendant's trial violated his right to a fundamentally fair trial under the sixth and fourteenth amendments (U.S. Const., amends. VI, XIV). The amended petition alleged that trial counsel was ineffective in failing to object to having a deputy sheriff escort defendant to and from the witness stand in the presence of the jury and stand behind defendant during his testimony. According to the amended petition, defendant suffered prejudice because "[t]his unwarranted security measure conveyed to the jury that the court believed [defendant] posed a danger, thereby undermining his credibility before he testified and denying him the presumption of innocence."

The amended post-conviction petition also raised the claim that defendant was denied his constitutional right to effective assistance of counsel during the aggravation-mitigation phase of the sentencing hearing. The petition alleged that trial counsel was ineffective because counsel failed to investigate and present readily available mitigating evidence with respect to defendant's turbulent family background, his long-standing cognitive impairments, and the possibility of neurological disturbances.

In support of the allegations in his petition, defendant attached his own affidavits, in which he recounted the security measures taken during his trial, his absence from the *in camera voir dire* sessions, and that he had been fingerprinted on three occasions after his arrest. With respect to the security measures employed at his trial, defendant stated that, during jury selection and throughout the trial, "whenever I was seated at the defense table there were always two uniformed deputy sheriffs behind me *** seated in chairs about an arm's length away from me, and sometimes they stood behind

me." Defendant further stated that when he was called as a witness on his own behalf, another deputy sheriff "came over to the defense table and walked behind me as I went over to the witness box." According to defendant, "this deputy then stood behind and to the left of the witness box during my testimony, and at the conclusion of my testimony he walked behind me as I returned to my seat at the defense table *** while the jury was in the courtroom." With respect to his absence from the in-chambers *voir dire,* defendant recounted in his affidavit that "[d]uring the selection of the jury, on several occasions that I was aware of, the judge and all the attorneys left the courtroom and went into the judge's chambers to talk to a juror." According to defendant, "[o]n all of these occasions I remained in the courtroom, and I was never told by the judge or my attorneys that I could be present when a juror was being questioned in chambers."

Defendant's amended post-conviction petition was also supported by several affidavits submitted by his relatives and friends. Affidavits submitted by defendant's grandmother, sister, uncle, two aunts, and former girlfriend related defendant's unstable family background, which was hallmarked by a pattern of abuse and violence. The affiants stated that during defendant's youth, defendant's mother engaged in a series of abusive relationships, was beset by various physical and mental-health disorders, and had inflicted harsh punishment on defendant bordering on abuse. The affiants revealed that due to the unstable personal relationships of defendant's mother, defendant's family moved often, and that defendant was routinely in trouble at school, "missing classes frequently" and "fighting, physically and verbally, with the teachers." Defendant was also in trouble at home, where he set fires and cut up furniture with a knife. The affiants further stated that defendant had contracted spinal meningitis at age four and was hospital-

ized for an extended period of time, and that shortly before the offenses in the case at bar he had been hit by a car and suffered a head injury. The affiants also averred that defendant had a quick and violent temper and that he was violent in his relationships with his family and friends.

Those affiants who testified on behalf of defendant during his sentencing hearing stated that defendant's attorneys offered no preparation to them before they took the witness stand, other than instructing them to tell the judge "something that [defendant] had done that meant a lot" to them. The remainder of the affiants stated that they were not contacted by defense counsel and, if they had been contacted, would have testified on defendant's behalf during the second phase of the sentencing hearing.

Defendant's amended post-conviction petition was also supported by affidavits and reports submitted by professionals. Dr. Michael Gelbort, a clinical psychologist, submitted to the circuit court a "neuropsychological evaluation" of defendant based upon a July 11, 1994, examination. In his report, Dr. Gelbort stated that defendant had a full scale IQ of 88, with his reading and spelling skills testing at the high school level, and his math skills testing at the sixth-grade level.

According to Dr. Gelbort's report, defendant suffers from "cognitive dysfunction most affecting non-dominant cerebral hemisphere functions and frontal lobe abilities." Dr. Gelbort explained in the report that the frontal lobe is "the part of the brain which initiates and inhibits behavior, thus allowing people to have control over their actions." Dr. Gelbort also stated that the frontal lobe is "the portion of the brain where complex decisions are believed to be made." According to Dr. Gelbort, individuals with an impairment in the frontal lobe "will often make poor decisions, will fail to 'think ahead' or antici-

pate the outcome of their behavior, will have an inability to consistently have their behavior meet the expectations of others and society, and may be unpredictable or odd in their behavior."

Based upon his examination of defendant, Dr. Gelbort concluded that defendant suffers from "minimal brain dysfunction" which "has an effect on [defendant's] ability to think in a logical, goal directed manner." Due to this impairment, Dr. Gelbort opined, defendant's "[j]udgement, problem solving, and reasoning are affected and impaired" and defendant's "everyday activities and ability to plan ahead" is adversely affected. Dr. Gelbort stated that this impairment "would almost certainly have been present at the time of the offense." As a final note, Dr. Gelbort also found that defendant's "recollection of past events tends to 'normalize' his experience" to the extent that defendant "minimized or denied" many of the problems he experienced during his lifetime.

An affidavit and report prepared by mitigation specialist Caryn Platt Tatelli was also attached in support of defendant's amended post-conviction petition. According to Tatelli, the information contained within her mitigation report was gathered by speaking with defendant on five occasions in 1994, by interviewing approximately 20 of defendant's relatives and friends, and by reviewing defendant's school, hospital and employment records, as well as public records pertaining to defendant's immediate family.

In her report, Tatelli stated that defendant's family "has a pervasive history of child abuse and maltreatment which can be traced through at least three generational cycles." Tatelli wrote that within defendant's family, there exists a "generational pattern, and acceptance of, violence, temper expressed in rage, and aggression." Tatelli determined that defendant's family has "utilized

violence and force as a means of solving and reconciling their differences with others."

Tatelli's report focused in large part on defendant's mother, who "was abused by her own mother," and, as a victim of this abuse, "she, in turn, was taught that abusive behavior was an acceptable method through which to discipline children." Tatelli stated that as a result of a series of transient and abusive relationships entered into by defendant's mother, defendant, during his early years, had "a turbulent life in which he lived in an abusive setting." Defendant's family life was unstable, and defendant's family moved often. In her mitigation report, Tatelli concluded that defendant was raised in a "dysfunctional system" wherein he "was exposed to a great deal of violence through his mother and her relationships," that the discipline he received at home was "extreme" and "could be considered child abuse," and that defendant "did not have any man who could serve as a positive role model."

Tatelli's report further related that at the age of four, defendant contracted spinal meningitis and was hospitalized for 10 days. After this illness, family members noticed a change in defendant's behavior, cognitive abilities, and social skills. As a result, defendant received behavioral therapy. When defendant was eight years of age, he started a fire in the basement of the family home. Tatelli reported that family members believed that this was an example of defendant "constantly doing what he had been told not to do, almost as if he did not understand the behavioral boundaries which had been set for him."

As defendant grew older, he began "running away, setting fires, and having school difficulties." Tatelli stated that defendant's school records indicated that defendant attended school sporadically, and that he had been a student at 13 different schools before dropping out in the tenth grade. During his school years, defendant was

diagnosed as having a learning disability, as well as having behavioral, visual and motor problems.

In her report, Tatelli stated that during defendant's teenage years, he and his sister Kimberly fought "passionately" with each other, and "[v]arious sources give clear examples of indiscriminate violence during [their] physical fights." In addition, it was during defendant's teenage years that defendant's family moved into a Chicago housing project, and defendant became involved with gangs and started experimenting with drugs. Shortly thereafter, defendant's family moved from Chicago to the suburbs. However, even after defendant's family moved to the suburbs, the family remained unstable, and, according to Tatelli's report, lived in four different residences during six years.

After the move, Tatelli reports, defendant became involved in a series of romantic relationships, "all of which [had] underpinnings of violence." Tatelli stated that the "reports of inter-relationship violence corroborate other reports made of [defendant's] temper" and that "[m]any, if not all of the sources indicated that [defendant] has an extremely hot and volatile temper." According to Tatelli, defendant "rapidly reached a boiling point, or a level of explosiveness which could not be controlled." Tatelli related that defendant's family members "freely admit that they are a family which has trouble dealing with its temper."

At the age of 18, defendant was arrested for attempted rape and pled guilty to the charges. Although defendant maintained his innocence, he agreed to plead guilty because he would be eligible for parole. Defendant was paroled at age 20. Shortly thereafter, while riding a bus, defendant and another man had an argument, which resulted in defendant and the man running down the street. When a police officer stopped the men, defendant was found in possession of a knife, and his parole was

revoked. Defendant was released one year later. Tatelli stated that defendant's employment records indicated that defendant had a number of different jobs, worked at each for only a brief period of time, and often had been dismissed due to "excessive absenteeism or tardiness."

In 1986, defendant was struck by a car and suffered injuries to his knee and head. According to Tatelli, sources indicated that defendant's temper, "which was always strong, seemed even more easily ignited than before, with little things triggering intense anger." When defendant had a difficult breakup with a woman he had been dating, defendant attempted suicide by taking a number of over-the-counter medications. According to Tatelli, defendant's suicide attempt was consistent with his history of "reckless driving, drug usage, and other potentially self-harming activities." Even defendant's relationship with his fiancée, Vanessa Allen, was marked by frequent fights, which were "usually verbal, but sometimes accelerated to the degree that they became physical." In her mitigation report, Tatelli concluded that "[a]s a result of the forces acting upon [defendant], he began to turn the naturally-occurring anger, frustration and hatred for his life situation inward, upon himself, allowing it to build into a horrible temper, as was the method of his family. In turning the anger inward, rather than expressing it in positive, natural ways, he began to harbor a deep-seated rage." Attached to Tatelli's report were defendant's school and medical records.

On December 8, 1994, the State filed an amended motion to dismiss defendant's amended post-conviction petition. Oral argument on the State's dismissal motion was held on April 15, 1995; on January 30, 1996, the same circuit court judge who presided at defendant's trial granted the State's motion to dismiss defendant's amended post-conviction petition without an evidentiary hearing.

The circuit court rejected the allegation in defendant's amended post-conviction petition that his due process rights were violated by the in-chambers *voir dire* of prospective jurors, finding the issue waived because it could have been raised on direct appeal. Similarly, the circuit court found that defendant had waived any claim that his trial counsel were ineffective for failing to present blood and fingerprint evidence at trial.

The circuit court also rejected defendant's contention that the security measures employed in the courtroom during the jury portion of defendant's trial violated his right to a fair trial. The court found that "no extraordinary measures were adopted by this court," that at all times during the trial "the defendant appeared in street clothes *** and civilian garb," and that the security measures were "reasonable under the circumstances." The court concluded that, under the facts presented, defendant "would not be able to substantiate his claim that he was prejudiced and that a different result might obtain."

Finally, the circuit court also rejected defendant's contention that defense counsel were ineffective at sentencing for failing to investigate and present additional mitigating evidence. The circuit court agreed with the State's assertion that the proffered additional mitigation evidence regarding defendant's family background and psychological condition "would tend to show the court that [defendant] is, in fact, dangerous," as well as "his capacity for future conduct." The circuit court concluded that "the argument in and of itself is not inherently mitigating."

On February 27, 1996, defendant filed with the circuit court a motion to reconsider its ruling. The circuit court denied this motion on June 25, 1997. Defendant then filed his notice of appeal to this court on July 23, 1997. In September 1998, while the instant appeal was pend-

ing before this court, defendant filed in the circuit court a motion, pursuant to section 116—3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116—3 (West 1998)), requesting forensic DNA testing on blood evidence recovered from the victim's apartment regarding his claim of actual innocence. On October 15, 1998, both the State and defendant entered into an agreed order for blood evidence to be subjected to DNA analysis. On November 3, 1998, this court granted the parties' agreed motion to stay the briefing schedule in this matter until completion of the DNA testing. On July 18, 2000, the Illinois State Forensic Science Center issued a report stating that a bloodstain found in the kitchen sink of the victim's apartment matched defendant's DNA profile and could not have come from the victim. At defendant's request, the blood evidence was then sent to an independent laboratory, Cellmark Diagnostics, for further review. On May 2, 2001, Cellmark issued a letter concluding that neither the processing of the case by the Forensic Science Center nor the results and conclusions reached by the Center were in error.

## ANALYSIS

The Post-Conviction Hearing Act (the Act) (725 ILCS 5/122—1 *et seq.* (West 1996)) provides a mechanism by which criminal defendants can assert that their convictions and sentences were the result of a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. See 725 ILCS 5/122—1 (West 1996). An action for post-conviction relief is a collateral proceeding, and is not an appeal from the underlying conviction and sentence. *People v. Mahaffey*, 194 Ill. 2d 154, 170 (2000); *People v. Haynes*, 192 Ill. 2d 437, 464 (2000). In order to be entitled to post-conviction relief, a defendant bears the burden of establishing a substantial deprivation of federal or state constitutional rights in the proceedings that produced the judgment be-

ing challenged. *People v. Morgan*, 187 Ill. 2d 500, 528 (1999); *People v. Tenner*, 175 Ill. 2d 372, 378 (1997).

The purpose of a post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, nor could have been, adjudicated previously upon direct appeal. *Haynes*, 192 Ill. 2d at 464; *Morgan*, 187 Ill. 2d at 528. Because a proceeding brought under the Act is a collateral attack on defendant's conviction and/or sentence, the doctrine of *res judicata* bars consideration of issues that were raised and decided on direct appeal. *People v. Towns*, 182 Ill. 2d 491, 502 (1998); *People v. Whitehead*, 169 Ill. 2d 355, 371 (1996). Further, issues that could have been presented on direct appeal, but were not, are waived for purposes of post-conviction review. *Haynes*, 192 Ill. 2d at 465; *Towns*, 182 Ill. 2d at 503. However, the doctrines of *res judicata* and waiver will be relaxed in three situations: where fundamental fairness so requires; where the alleged waiver is attributable to the incompetence of appellate counsel; or where the facts relating to the post-conviction claim do not appear on the face of the original record. *Mahaffey*, 194 Ill. 2d at 171; *Whitehead*, 169 Ill. 2d at 371-72.

A defendant is not entitled to an evidentiary hearing as of right on post-conviction claims. *Mahaffey*, 194 Ill. 2d at 171; *Whitehead*, 169 Ill. 2d at 370-71. An evidentiary hearing is warranted on a post-conviction claim only where the allegations in the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that the constitutional rights of the defendant have been violated. *Haynes*, 192 Ill. 2d at 465; *Morgan*, 187 Ill. 2d at 528. For the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the post-conviction petition and any accompanying affidavits are taken as true. *Towns*, 182 Ill. 2d at 503; *People v. Bris-*

*bon*, 164 Ill. 2d 236, 244-45 (1995). A circuit court's ruling on the sufficiency of the allegations contained in a post-conviction petition is a legal determination. *People v. Coleman*, 183 Ill. 2d 366, 388 (1998). Therefore, we review *de novo* a post-conviction petition that has been dismissed without an evidentiary hearing. *Morgan*, 187 Ill. 2d at 528; *Coleman*, 183 Ill. 2d at 389.

With these principles in mind, we consider whether the circuit court erred in dismissing defendant's post-conviction petition without an evidentiary hearing. Before this court, defendant raises four claims for review. We address each of these claims *seriatim*.

## I. Jury Selection

Defendant contends that on direct appeal, appellate counsel was deficient because counsel failed to argue that defendant's exclusion from the *in camera* portion of the *voir dire* violated his right to be present under the due process clause of the fourteenth amendment of the United States Constitution. U.S. Const., amend. XIV. When determining whether a defendant has made a substantial showing that his constitutional rights have been violated by the incompetence of appellate counsel, we employ the familiar standards for claims alleging ineffective assistance of counsel set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *Coleman*, 183 Ill. 2d at 397.

In *Strickland*, the Court held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064. Pursuant to *Strickland*, in order to succeed on a claim asserting that the assistance of counsel was so defective as to require reversal of a conviction or death sentence, a

defendant must satisfy two components. First, a defendant must establish that his defense counsel's performance was deficient. This requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. A defendant meets this burden by establishing that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. In ruling on a claim that counsel was ineffective, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065. Accordingly, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 100 L. Ed. 83, 93, 76 S. Ct. 158, 164 (1955). *Coleman*, 183 Ill. 2d at 397.

In order to prevail on an ineffective assistance of counsel claim, *Strickland* requires that in addition to establishing that counsel was deficient, a defendant must also establish that counsel's deficiencies resulted in prejudice. The *Strickland* Court explained that "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution" (*Strickland*, 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067), and that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 696, 104 S. Ct. at

2066. Under *Strickland*, a defendant establishes prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. When a defendant challenges a death sentence, the specific question is "whether there is a reasonable probability that, absent the errors, the sentencer *** would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury *** [and] must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 695-96, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2069. The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *Morgan*, 187 Ill. 2d at 530.

As stated, claims of ineffective assistance of appellate counsel are evaluated under the two-prong standard set forth in *Strickland*. *Haynes*, 192 Ill. 2d at 476; *People v. Childress*, 191 Ill. 2d 168, 175 (2000). However, to succeed on a claim that appellate counsel rendered ineffective assistance by failing to argue an issue on appeal, a defendant must specifically establish that appellate counsel's failure to raise that issue was objectively unreasonable and that appellate counsel's decision not to raise the issue prejudiced defendant. *Haynes*, 192 Ill. 2d at 476; *Childress*, 191 Ill. 2d at 175. "Appellate counsel is not obligated to brief every issue on appeal, and it is

not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Thus, if the underlying issue is not meritorious, defendant has suffered no prejudice from counsel's failure to raise that issue on appeal. *Easley*, 192 Ill. 2d at 329; *Childress*, 191 Ill. 2d at 175.

The State initially argues that defendant has failed to allege a cognizable claim for ineffective assistance of appellate counsel because defendant's underlying due process claim is grounded in facts which are outside the record on direct appeal. In its brief to this court, the State contends that "there is nothing in the report of proceedings from [defendant's] direct appeal that would indicate that [defendant] was absent during the out-of-court hearings that occurred during the selection of the jury, including the questioning of the three potential jurors who ultimately served on the jury." Therefore, the State concludes, "this matter concerns the total lack of a factual basis in the record upon which the claim could have been presented to this court on direct appeal."

We disagree. Our thorough examination of the record reveals that defendant was not present during the *in camera* questioning of prospective jurors. This conclusion is supported by the position taken by the State before the circuit court in the post-conviction proceedings below. In the matter at bar, the State argued below that because defendant failed to raise on direct appeal his exclusion from the *in camera voir dire*, defendant thereby waived his post-conviction claim that his absence from the in-chambers questioning of several venire members violated his right to due process. In addition, the State argued below that defendant failed to show that his appellate counsel was ineffective for not raising this issue on direct appeal. According to the State in its amended motion to

dismiss defendant's amended post-conviction petition, defendant made "no showing that [counsel's] assessment of the issues was deficient" or that "there is a reasonable probability that the Illinois Supreme Court would have reversed his conviction." Thus, the State's position before the circuit court during the post-conviction proceedings was that the appellate record presented the due process issue, that appellate counsel could have raised this issue on direct appeal if counsel believed it was meritorious, that appellate counsel's failure to do so constituted waiver, and that defendant failed to show that appellate counsel's actions were ineffective. Indeed, it was on the basis of defendant's waiver of this issue on direct appeal that the circuit court granted the State's motion to dismiss this specific post-conviction claim.

Because defendant's absence from the *in camera voir dire* is apparent from the record, any constitutional issues flowing from this absence could have been raised on direct appeal. The waiver doctrine, however, is inapplicable where, as here, a defendant asserts that the alleged waiver stems from the ineffective assistance of appellate counsel. *Haynes*, 192 Ill. 2d at 476. We therefore turn to the merits of defendant's argument.

In the matter at bar, defendant's appellate counsel filed defendant's brief on direct appeal on December 24, 1991, over 1½ years after this court issued its opinion in *People v. Bean*, 137 Ill. 2d 65 (1990). Defendant contends that the performance of his appellate counsel was objectively unreasonable because counsel failed to argue on direct appeal that, under this court's ruling in *Bean*, defendant's absence from pretrial *in camera* questioning of 15 venire members, including 3 who ultimately sat on his jury, violated his fourteenth amendment due process right to be present. Defendant further contends that appellate counsel's decision not to raise this issue on direct appeal prejudiced defendant, as there is a reasonable

probability that had this issue been raised on direct appeal, defendant would have prevailed. We disagree.

In *Bean*, the defendant was convicted of murder and sentenced to death. On appeal, the defendant argued that the trial court had committed reversible error by conducting an individual *voir dire* of six jury venire members in the judge's chambers, outside the presence of the defendant. The discussions were initiated by the trial judge when three of the venire members said they had been exposed to publicity about the murder, when two had difficulty expressing their views on the death penalty, and when one stated that his previous services as a juror in a murder trial might impair his fairness and impartiality in the defendant's trial. On each occasion, the trial judge, in open court and in the presence of the defendant, instructed the venire members to come back to his chambers. These in-chambers discussions were attended by defendant's attorneys, the prosecutors, and a court reporter. *Bean*, 137 Ill. 2d at 79.

The defendant in *Bean* argued that his absence from the *in camera voir dire* sessions deprived him of his constitutional right to be present during the entire jury selection process, under both the Illinois and United States Constitutions. As defendant in the case at bar premises this specific post-conviction claim solely upon an alleged violation of his right to due process under the fourteenth amendment of the United States Constitution, we confine our discussion to that portion of the *Bean* decision which analyzed Bean's federal claims.

In *Bean*, this court's analysis proceeded from the basic principle that under the United States Constitution, criminal defendants are given the general right to be present at every stage of trial, including jury selection. However, the situations in which the denial of a defendant's right of presence actually violates the United States Constitution are limited, as "this Federal right of

presence is not an express constitutional right but arises from the due process clause of the fourteenth amendment." *Bean*, 137 Ill. 2d at 82. Accordingly, "the Federal right of presence is not an absolute, inviolable right; instead, its scope is contained within the scope of due process." *Bean*, 137 Ill. 2d at 82. Therefore, "as long as a defendant's absence from a portion of his trial does not deprive him of due process, there is no violation of a defendant's derivative due process right of presence under the United States Constitution." *Bean*, 137 Ill. 2d at 83.

The *Bean* court held that under the due process clause of the fourteenth amendment, a criminal defendant's right of presence "is violated only when a defendant's absence results in his being denied a fair and just trial." *Bean*, 137 Ill. 2d at 83, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107-08, 78 L. Ed. 674, 679, 54 S. Ct. 330, 333 (1934) ("So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only"); see also *Kentucky v. Stincer*, 482 U.S. 730, 745, 96 L. Ed. 2d 631, 647, 107 S. Ct. 2658, 2667 (1987) ("a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure"). Although jury selection is "a critical stage of trial," the *Bean* court rejected the argument advanced by the defendant that his right to be present at this stage "encompasses every moment of the jury selection process." *Bean*, 137 Ill. 2d at 84. The *Bean* court emphasized that, alone, a defendant's absence from jury selection does not violate the Constitution. Rather, where a defendant is absent from a portion of jury selection, the proper inquiry is whether the defendant's absence results in his being denied a fair trial, which, in

turn, rests upon a determination "concern[ing] the impartiality of defendant's jury." *Bean*, 137 Ill. 2d at 84. Accordingly, the *Bean* court framed the issue as follows: "Did defendant's absence from the *in camera voir dire* cause him to be tried, convicted, and sentenced by a jury prejudiced against him?" *Bean*, 137 Ill. 2d at 85.

The *Bean* court answered this question in the negative. The court noted that the defendant did not dispute the impartiality of the jury; rather, the defendant claimed that he had an absolute right to be present at all times and that, but for his absence, the defendant might not have allowed his attorney to use a peremptory challenge against a certain venire member. This court held that the defendant's claim "falls short of establishing a due process violation, for defendant does not assert that the juror who served in place of [the] venire member [peremptorily challenged by defense counsel] was prejudiced." *Bean*, 137 Ill. 2d at 85. The *Bean* court then stated that "while we hold that defendant's due process right of presence was not violated in this case, we note that the procedure of *in camera voir dire* without defendant's presence and without defendant's express waiver of this right is improper and, in some cases, will inevitably result in the denial of a defendant's fundamental rights to a fair trial by an impartial jury." *Bean*, 137 Ill. 2d at 88.

Relying solely upon *Bean*, defendant at bar contends that his appellate counsel was ineffective for failing to argue on direct appeal that defendant's exclusion from the *in camera voir dire* of several venire members violated his right to due process under the fourteenth amendment and entitled him to a new trial. We agree with defendant that there are several similarities between his case and the facts set forth in *Bean*. In both cases, *in camera voir dire* of several venire members took place outside of the defendants' presence after these

venire members had been initially questioned in the defendants' presence in open court. Also in both cases, the *in camera voir dire* took place in the presence of defense counsel. Although defendant at bar notes these similarities, and acknowledges that the court in *Bean* denied the defendant relief on his fourteenth amendment due process claim, defendant argues that there exists a significant factual difference between his case and *Bean* that militates in favor of an opposite result. Defendant contends that, unlike in *Bean*, three venire members who were questioned outside defendant's presence "and who could have been removed by [defendant] with peremptory challenges" ultimately sat on his jury. According to defendant, this distinction between his case and *Bean* would have caused this court, had it been presented with this issue by appellate counsel on direct appeal, to apply the rules set forth in *Bean* and conclude that defendant at bar, unlike the defendant in *Bean*, was denied a fundamental right to a fair trial by an impartial jury. We disagree.

In his arguments before this court, defendant argues that of the 15 prospective jurors subject to *in camera voir dire* outside his presence, three ultimately sat on the jury which convicted him. Defendant names these three venire members as Marybeth Jansen, Bernard Crowley, and Richard Serrano, and argues that, as to each of these three persons, defendant's presence during the *in camera* proceedings would have "contributed to the fairness of the proceedings." Specifically, defendant contends that, had he been present during the in-chambers questioning, he "could have advised his attorneys to use peremptory challenges" to remove any venire members he considered "potentially biased."

We first address defendant's claim with respect to

juror Marybeth Jansen.[1] Our close examination of the record reveals that on February 21, 1990, Jansen was called as one of the first group of 12 prospective jurors to be examined by both the defense and the prosecution in open court and in the presence of defendant. Jansen, in addition to the other members of this 12-person panel, was questioned by the trial court judge in detail concerning her background and ability to be impartial. The record reveals that, at the close of the questioning of the prospective jurors for that day, an unidentified venire member informed the trial court judge in open court that service on the jury would be a "hardship on my business." According to defendant, based upon the context of the statements, it appears that this comment was made by Jansen. When court resumed the next day, Jansen was accepted by the State and tendered to the defense. After exercising peremptory challenges to excuse two of the four prospective jurors on the panel, the defense accepted Jansen. Thereupon, Jansen was sworn as a juror in defendant's case.

It has long been recognized that once a juror has been accepted and sworn, neither party has the right to peremptorily challenge that juror. *People v. Curran*, 286 Ill. 302, 307-08 (1918); see also *People v. Brooks*, 185 Ill. App. 3d 935, 939 (1989); *People v. Jarnagan*, 154 Ill. App. 3d 187, 197 (1987); *People v. Castro*, 146 Ill. App. 3d 629, 630 (1986); *People v. Scheidt*, 113 Ill. App. 3d 632, 636-37 (1983); *People v. Watson*, 103 Ill. App. 3d 992, 997 (1982); *People v. Gamboa*, 30 Ill. App. 3d 242, 252 (1975); *People v. Manns*, 1 Ill. App. 3d 871, 876 (1971). Although the circuit court retains the right to dismiss a selected and

[1]Defendant, in his brief to this court, inaccurately states that Marybeth Jansen "ultimately served as the foreman of [defendant's] jury." This statement was repeated by defense counsel during oral argument before this court. The record reveals that juror Jansen was a member, not the foreperson, of defendant's jury.

sworn juror for cause (see *Jarnagan*, 154 Ill. App. 3d at 197; *Watson*, 103 Ill. App. 3d at 997), the parties no longer possess the right to exercise a peremptory challenge. We hold that defendant has failed to present a cognizable post-conviction claim with respect to juror Jansen. The record reveals that the entire questioning process of Jansen prior to her being accepted and sworn as a juror in defendant's case occurred in open court and in the presence of defendant. At that time, defendant had full opportunity to witness the questioning of Jansen, observe her demeanor, assess the import of her answers, and advise his attorney to exercise an available peremptory challenge against her. Defendant chose not to exercise a peremptory challenge against Jansen, despite the fact that defendant attributes an in-court comment to Jansen that jury duty would serve as a "hardship" on her business, and despite the fact that defendant exercised peremptory challenges against two other members of Jansen's panel. Defendant cannot now claim that he was denied his right to exercise a peremptory challenge against Jansen as a result of an *in camera* conversation she had with the trial court judge and the parties' counsel concerning her business concerns *after* she was accepted and sworn as a juror. Accordingly, the circuit court properly dismissed this post-conviction claim without an evidentiary hearing.

We now address defendant's arguments with respect to jurors Bernard Crowley and Richard Serrano. The record reveals that, prior to their *in camera voir dire*, both Crowley and Serrano were extensively questioned with respect to their backgrounds and their ability to be impartial by the trial court judge in open court and in the presence of defendant.

As to juror Crowley, prior to the *in camera* questioning, Crowley fully disclosed in open court the nature and extent of his employment as a docket clerk with a large

law firm and the fact that his son-in-law was employed as an assistant State's Attorney. Crowley stated that he had retired from his employment as a docket clerk after 12 years with the firm, that he maintained the firm's daily dockets, and that while the firm did some criminal defense work, he had no feelings one way or the other about criminal practice. With respect to his son-in-law who was employed as an assistant State's Attorney, Crowley stated that although they visited occasionally on a social basis, they never discussed legal cases and, if he was selected as a juror, Crowley would not discuss defendant's case with his son-in-law. Crowley affirmed that if he was selected as a juror, he could be fair and impartial, he would follow the law and instructions given to him, and he had no predisposition to either the defense or the prosecution.

Prior to recessing court for the evening, the trial court judge admonished the prospective jurors to avoid looking at newspapers. In response, Crowley stated in open court that "[t]here was an article last night" relating to defendant's trial in a newspaper and that he had "started" to look at it. The trial court judge stated that he would examine Crowley further on this issue when court reconvened. The next day, the trial court judge questioned Crowley, in chambers and in the presence of counsel for both parties, with respect to the newspaper article. Crowley stated that he had "glance[d]" at the first few sentences of the article and then stopped. Crowley stated that as a result of glancing at the newspaper article, he did not form any decisions, still had an open mind with respect to defendant's case, and still could be fair to both parties. The prosecution then briefly asked Crowley to again discuss his responsibilities as a docket clerk for the law firm and any contact Crowley may have had with criminal defense attorneys at the firm. Crowley replied that he had limited contact with the firm's

criminal attorneys and never spoke with them concerning criminal cases. Defense counsel then asked Crowley whether contact with his son-in-law, employed as an assistant State's Attorney, influenced Crowley with respect to "any presumptions of the criminal justice system." Crowley replied in the negative.

With respect to juror Serrano, he was initially questioned in open court and in the presence of defendant with respect to his background. During this questioning, Serrano stated that he was active in his church and participated in church functions and social groups. Although he had strong religious beliefs, Serrano stated, he would follow the law and instructions provided to him by the court and his religious beliefs would not conflict with this duty. According to Serrano, he could be fair and impartial and he would "make [his] judgment on evidence."

During a sidebar, counsel for both the prosecution and defense requested that the judge inquire further of Serrano's religious beliefs and the effect these beliefs might have on his ability to be a fair and impartial juror. The judge agreed, and Serrano was further examined with respect to his religious beliefs in the judge's chambers in the presence of counsel for both sides. Serrano reiterated his statements made in open court that his religious beliefs would not conflict with the rules of law he would be required to apply as a juror.

In his submission to this court, defendant contends that had he been present during the *in camera* questioning of jurors Crowley and Serrano, "he could have advised his attorneys to use peremptory challenges to remove potentially biased jurors who ultimately sat on his case." Specifically, with respect to Crowley, defendant argues that, had he been present, he "would not have been required to accept Mr. Crowley's denials at face value, could have perceived that Mr. Crowley was not be-

ing entirely candid, and used a peremptory challenge to remove him." With respect to Serrano, defendant asserts that Serrano "appeared confused about the applicable burden and standard of proof in a manner detrimental to [defendant]," and that if he were present, defendant "could have concluded that Mr. Serrano's confusion about legal principles or his religious beliefs or both made him predisposed against a defendant."

We cannot accept defendant's argument. The record does not indicate in any way that Crowley was "not entirely candid." To the contrary, the record reveals that Crowley voluntarily disclosed, in open court, that he had seen a newspaper article about the trial. Further, the record does not support defendant's contentions that Serrano "appeared confused" about the applicable legal principles or that his religious beliefs interfered with his duties as a juror. Indeed, both jurors repeatedly stated in open court, as well as during the *in camera* questioning, that they would be fair and impartial and that they would follow the law and instructions provided to them by the court.

As we stated in *Bean*, a defendant's right to be present is not absolute; therefore, the fact that a defendant was absent during a portion of his trial does not automatically mean that the defendant has suffered a violation of his constitutional right to due process. Rather, a defendant's due process right of presence under the fourteenth amendment is violated only in the limited circumstance when his absence results in the denial of a fair and just trial. *Bean*, 137 Ill. 2d at 83; see also *People v. Lofton*, 194 Ill. 2d 40, 67 (2000); *People v. Bull*, 185 Ill. 2d 179, 201 (1998). Where, as here, a defendant alleges that his absence from a portion of jury selection violates his fourteenth amendment right to due process, the "fairness" issue "concerns the impartiality of defendant's jury." *Bean*, 137 Ill. 2d at 84; see also *Bull*, 185 Ill. 2d at

201. Therefore, a defendant must show that his absence from the *in camera voir dire* "cause[d] him to be tried, convicted, and sentenced by a jury prejudiced against him." *Bean*, 137 Ill. 2d at 85; see also *Bull*, 185 Ill. 2d at 202. In the matter at bar, defendant has neither alleged nor shown that Crowley and Serrano, or the jury as a whole, were prejudiced against him. Indeed, defendant at bar, like the defendant in *Bean*, does not claim that the jury which convicted him was not impartial. As in *Bean*, defendant raises speculative arguments with respect to the effect his presence might have had on the ultimate outcome of the jury-selection process, without asserting the jurors who actually sat on his jury were prejudiced. As this court concluded in *Bean*, "[t]he United States Constitution *** guarantees a defendant an impartial jury, not a jury of his choice." *Bean*, 137 Ill. 2d at 85.

As previously stated, a defendant has suffered no prejudice from appellate counsel's failure to raise an issue on direct appeal unless that issue is meritorious. *Childress*, 191 Ill. 2d at 175. Because we find that defendant's underlying constitutional claim based on *Bean* would not have been successful if raised on direct appeal, we conclude that defendant's ineffective assistance of appellate counsel claim lacks merit. Therefore, the circuit court appropriately dismissed this specific post-conviction claim without conducting an evidentiary hearing.

## II. Security Measures

Defendant next contends that the circuit court erred in dismissing, without an evidentiary hearing, defendant's claim that his right to a fair trial guaranteed by the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV) was violated by the "unwarranted" security measures used throughout his jury trial. Defendant also asserts that the circuit court committed error in denying him an eviden-

tiary hearing on the related claim that his trial counsel's failure to object to certain security measures deprived him of his right to the effective assistance of counsel guaranteed under the sixth and fourteenth amendments (U.S. Const., amends. VI, XIV).

As stated, for the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the post-conviction petition and any accompanying affidavits are taken as true. *Haynes*, 192 Ill. 2d at 466; *Coleman*, 183 Ill. 2d at 381. Defendant's amended post-conviction petition relies upon statements made by defendant in an affidavit attached to the amended petition. The amended petition alleges that during jury selection and throughout his trial, "two uniformed deputy sheriffs were seated, and sometimes stood, within arms' reach behind [defendant] as he sat at the defense table." The amended petition further alleges that "[w]hen [defendant] was subsequently called as a witness in the presence of the jury, the deputy sheriff in charge of the lock-up escorted him to the witness stand, stood behind him while he testified, and then escorted him back to the defense table." According to the amended petition, these "extraordinary security measures" were "highly prejudicial" to defendant.

The State responds that defendant's post-conviction claims with respect to the security measures employed during the jury portion of his trial are waived. According to the State, because "the fact that there were deputy sheriffs near [defendant] during the trial was of record," the "issue of the deputy sheriffs' proximity to [defendant]" could have been raised on direct appeal. We disagree. The specific facts contained within defendant's amended post-conviction petition and affidavit constitute new information which does not appear on the face of the original appellate record. Our careful examination of the record reveals that although the State is correct in

maintaining that the record reflects that deputy sheriffs were "near" defendant during the trial proceedings, the record does not reveal the nature and extent of the courtroom security measures actually employed during the proceedings. The amended petition, supported by defendant's affidavit, establishes the number, proximity and attire of the deputy sheriffs involved in guarding defendant, information which is not discernable from the record. In addition, the amended petition and defendant's affidavit constitute the sole evidence that defendant was escorted to and from the witness stand by a deputy sheriff in the presence of the jury. Because the rules of procedural default are relaxed where the facts relating to a defendant's post-conviction claim do not appear on the face of the original record (*Whitehead*, 169 Ill. 2d at 372; *People v. Eddmonds*, 143 Ill. 2d 501, 528 (1991)), we address the merits of defendant's claims.

As stated, a defendant is not entitled to an evidentiary hearing on his post-conviction petition as a matter of right. An evidentiary hearing is warranted only where the allegations of the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated. *Haynes*, 192 Ill. 2d at 472; *Morgan*, 187 Ill. 2d at 528. After carefully reviewing the defendant's amended petition and his affidavit, and taking all well-pleaded facts as true, we cannot say that defendant has made a substantial showing that there is a reasonable probability that he would not have been convicted of first degree murder if the challenged security measures had not been employed.

A defendant's right to a fair trial is a fundamental liberty interest secured by the sixth and fourteenth amendments to the United States Constitution. *Holbrook v. Flynn*, 475 U.S. 560, 567, 89 L. Ed. 2d 525, 533, 106 S. Ct. 1340, 1345 (1986). "The presumption of innocence,

although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503, 48 L. Ed. 2d 126, 130, 96 S. Ct. 1691, 1692 (1976). To safeguard the presumption of innocence, "courts must be alert to factors that may undermine the fairness of the fact-finding process" and must "carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Williams*, 425 U.S. at 503, 48 L. Ed. 2d at 130, 96 S. Ct. at 1693; see also *Holbrook*, 475 U.S. at 567, 89 L. Ed. 2d at 533, 106 S. Ct. at 1345 (central to the right to a fair trial is the principle that " 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial' "), quoting *Taylor v. Kentucky*, 436 U.S. 478, 485-86, 56 L. Ed. 2d 468, 475, 98 S. Ct. 1930, 1935 (1978). Indeed, certain practices may pose such a threat to the fairness of a trial that they must be subjected to "close judicial scrutiny." *Williams*, 425 U.S. at 504, 48 L. Ed. 2d at 130, 96 S. Ct. at 1693. When assessing the use of various practices or procedures in the courtroom, "[c]ourts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." *Williams*, 425 U.S. at 504, 48 L. Ed. 2d at 130, 96 S. Ct. at 1693.

This is not to say, however, that every courtroom practice which tends to single out a defendant from everyone else in the courtroom constitutes a violation of a defendant's constitutional rights. *Holbrook*, 475 U.S. at 567, 89 L. Ed. 2d at 533, 106 S. Ct. at 1345. The United States Supreme Court has recognized that "jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance" and that

"every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct" cannot be eliminated from court proceedings. *Holbrook*, 475 U.S. at 567, 89 L. Ed. 2d at 533-34, 106 S. Ct. at 1345.

In *Holbrook*, the Supreme Court held that the noticeable deployment of security personnel in a courtroom during trial is not a type of inherently prejudicial practice that should be permitted only where justified by an essential state interest specific to each trial. The *Holbrook* Court refused to find that the defendant's right to a fair trial was violated by the presence, at his trial with five codefendants, of four uniformed state troopers sitting in the first row of the spectator section of the courtroom. The Court explained that the "chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial" is that jurors could reasonably draw a "wide[ ] range of inferences *** from the officers' presence" and that such presence "need not be interpreted as a sign that [a defendant] is particularly dangerous or culpable." *Holbrook*, 475 U.S. at 569, 89 L. Ed. 2d at 534, 106 S. Ct. at 1346. The Court further stated that it could be "entirely possible that jurors will not infer anything at all from the presence of the guards," because "[o]ur society has become inured to the presence of armed guards in most public places," and they are "doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." *Holbrook*, 475 U.S. at 569, 89 L. Ed. 2d at 535, 106 S. Ct. at 1346. The Court therefore concluded that the presence of the uniformed officers in the courtroom did not pose an "unacceptable risk of prejudice" to the defendant and, accordingly, was not inherently prejudicial. *Holbrook*, 475 U.S. at 571, 89 L. Ed. 2d at 536, 106 S. Ct. at 1347.

In his brief to this court, defendant first contends

that the security measures employed during the jury portion of his trial were "inherently prejudicial" and places emphasis upon the fact that a sheriff's deputy escorted him to and from the witness stand and remained standing behind him during his testimony. Defendant's argument lacks merit. As discussed above, the Supreme Court in *Holbrook* rejected a presumption that "any use of identifiable security guards in the courtroom is inherently prejudicial" and held that "[i]n view of the variety of ways in which such guards can be deployed, *** a case-by-case approach is more appropriate." *Holbrook*, 475 U.S. at 569, 89 L. Ed. 2d at 535, 106 S. Ct. at 1346.

Defendant next contends that even if the security measures employed during his trial were not prejudicial *per se*, these measures nevertheless prejudiced defendant because they "could raise no inference other than that [defendant] was dangerous and guilty." We disagree. Previous decisions have found that defendants who were subjected to in-court security measures similar to those employed during defendant's trial did not suffer prejudice as a result of those measures. For example, courts have determined that no prejudice occurred when, during trial, an officer was positioned near the defendant rather than in the spectator section (*People v. Glasco*, 66 Ill. App. 2d 445, 448-49 (1966)), when two uniformed officers of the Department of Corrections were seated behind the defendant throughout his trial (*People v. Johnson*, 54 Ill. App. 3d 970, 972 (1977)), or when one uniformed guard was stationed behind the defense table, one guard was stationed at each entrance to the courtroom, and a group of guards were seated in the front row of the spectators' seats (*People v. Fields*, 322 Ill. App. 3d 1029, 1034-35 (2001)). Similarly, no prejudice occurred when a prospective jury panel observed a defendant being escorted into the courtroom by a uniformed sheriff's deputy and later saw one deputy take the place of another behind the

defendant (*People v. Shorter*, 59 Ill. App. 3d 468, 478 (1978)), when a uniformed United States marshall stood near a defendant as the latter testified (*United States v. Williams*, 897 F.2d 1430, 1434 (8th Cir. 1990)), or when a defendant was escorted to and from the witness stand by a uniformed deputy sheriff who stood behind the defendant as he testified (*People v. Hughes*, 205 Ill. App. 3d 79, 83 (1990)).

As the Court stated in *Holbrook*, a juror may reasonably draw a wide range of inferences from the presence of security personnel in the courtroom. Because "[i]t is 'a common courtroom practice' to have uniformed guards present" during court proceedings (*People v. Fields*, 322 Ill. App. 3d 1029, 1034 (2001), quoting *People v. Friesland*, 130 Ill. App. 3d 595, 598 (1985)), the "presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable" (*Holbrook*, 475 U.S. at 569, 89 L. Ed. 2d at 534, 106 S. Ct. at 1346). Our examination of the record leads us to agree with the trial court judge that "no extraordinary measures were adopted" with respect to courtroom security during defendant's trial. Further, there is no evidence of record that the number of guards or their weaponry "suggest[ed] particular official concern or alarm" (*Holbrook*, 475 U.S. at 569, 89 L. Ed. 2d at 535, 106 S. Ct. at 1346). Therefore, any inferences unfavorable to defendant under the circumstances at bar would be highly speculative.

Decisions regarding security and safety in the courtroom are squarely within the discretion of the trial court. *Fields*, 322 Ill. App. 3d at 1035; see also *People v. Buss*, 187 Ill. 2d 144, 216 (1999). Further, once the challenged security measures are found not to be inherently prejudicial, the defendant bears the burden of affirmatively demonstrating actual prejudice as a result of the in-court security. *Holbrook*, 475 U.S. at 572, 89 L. Ed.

2d at 537, 106 S. Ct. at 1347-48; *Williams*, 897 F.2d at 1434. We conclude that the evidence presented by defendant is inadequate to make a substantial showing that, as a result of the security measures employed in this case, defendant suffered prejudice and was denied a right to a fair trial. The circuit court judge, therefore, appropriately dismissed this post-conviction claim without an evidentiary hearing.

Accordingly, we also reject defendant's related post-conviction claim that he was denied effective assistance of trial counsel as a result of counsel's failure to preserve defendant's claim that his constitutional rights were violated when he was escorted by a uniformed deputy to and from the witness stand by either objecting to this practice at trial or including this specific claim in a post-trial motion. As stated, under *Strickland*, defense counsel is ineffective only if the performance of counsel falls below an objective standard of reasonableness, and counsel's error results in prejudice to the defendant. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Morgan*, 187 Ill. 2d at 529-30. However, if the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not determine whether counsel's performance was constitutionally deficient. *Morgan*, 187 Ill. 2d at 530. Because we have held above that the underlying issue has no merit, defendant has suffered no prejudice due to trial counsel's failure to preserve this meritless issue for appeal. Therefore, the circuit court correctly dismissed this post-conviction claim without an evidentiary hearing.

### III. Failure to Present "Exculpatory" Evidence

In his opening brief to this court, defendant contended that the circuit court erred in failing to grant him an evidentiary hearing on his post-conviction claim that his counsel was ineffective for failing to present "exculpa-

tory" blood and fingerprint evidence during his trial. Specifically, defendant argued that his trial counsel ineffectively failed to make a timely motion to preserve blood evidence obtained from the victim's apartment and, had the evidence been so preserved, DNA testing might have established that he was not the source of the type A blood found at the crime scene. Defendant further alleged that his trial counsel was ineffective by failing to present evidence at trial that the Illinois State Police crime lab had determined that certain latent fingerprints discovered in the victim's apartment did not belong to any known individual, including defendant. Defendant alleged in his post-conviction petition that had counsel presented evidence that the fingerprints left at the crime scene were not those of defendant, the result of the trial would have been different, as "[t]he jury could have reasonably concluded that the unidentified fingerprints found at the crime scene were left there by the offender and that the offender was therefore not [defendant]."

Defendant filed his opening brief with this court on April 27, 1998. Subsequent to this filing, both the State and defendant entered into an agreed order that the blood evidence be subjected to DNA testing at the Illinois State Police Forensic Science Center. Accordingly, the briefing in this case was stayed, pending the outcome of these tests. On July 18, 2000, a report was issued by the Illinois State Police Forensic Science Center concluding that a bloodstain found in the kitchen sink of the victim's apartment "matches" defendant's DNA profile "and could not have originated from [the vicitm]."[2] Defendant thereafter forwarded the Forensic Science Center's laboratory case file and standard operating procedures to

[2]The report stated that the DNA profile of the blood found in the victim's apartment "would be expected to occur in approximately 1 in 18 quadrillion Black, 1 in 30 quadrillion White or 1 in 26 quadrillion Hispanic unrelated individuals."

an independent laboratory, Cellmark Diagnostics, for review. On May 2, 2001, Cellmark issued a letter concluding that it could "not identify any errors in the processing of the case, in the results, or in the conclusions reached" by the Illinois State Police Forensic Science Center.

Subsequently, defendant filed a reply brief with this court, in which he "concedes that he is unable to prevail" on the blood-evidence issue "in light of the results of recent DNA testing." Because the result of the DNA analysis contradicts the basis of defendant's post-conviction claim with respect to the blood evidence, we affirm the post-conviction court's dismissal of this specific claim without an evidentiary hearing.

We next turn to defendant's claim that trial counsel was ineffective in failing to present evidence to the jury that the Illinois State Crime Lab had concluded that 10 latent fingerprints found at the murder scene did not belong to the victim, her roommate, their neighbor Kenneth Evenson, or defendant. Our review of the record of proceedings of defendant's trial discloses the following. After comparing the latent prints recovered from the victim's apartment with known fingerprints taken from defendant when he was arrested for a prior, unrelated offense in 1982, a crime lab investigator concluded that there was no match. Outside the presence of the jury, defense counsel argued that they should be allowed to present evidence that there was no fingerprint match without disclosing to the jury that the fingerprint comparison was conducted by using fingerprints obtained from defendant as the result of a prior arrest. Defense counsel maintained that disclosure of defendant's prior arrest to the jury would be unduly prejudicial. The State objected, contending that a proper foundation for defendant's 1982 fingerprints required counsel to establish when and where the fingerprints were obtained. The

trial court judge expressed concern that the use of the 1982 fingerprints could mislead the jury on the basis that defendant's prints could have changed over the years as a result of trauma to his fingers, such as cuts or scars. At the court's request, the fingerprint examiner who excluded defendant based upon the 1982 prints was brought into chambers and stated that any scarring or cuts on defendant's hands after the 1982 fingerprinting would not have affected his comparison with the latent fingerprints found at the crime scene. After considering the arguments of the parties, the trial court judge ruled that although the defense did not have to lay a foundation for the 1982 fingerprints of defendant used in the comparison, the prosecution on cross-examination would be allowed to inquire as to the origin of defendant's fingerprints. Defense counsel then decided not to present the fingerprint evidence at trial.

In his post-conviction petition, defendant asserts that in light of the adverse ruling by the trial court, defense counsel could have "safely presented expert testimony that the unknown fingerprints found at the scene did not belong to [defendant] based on fingerprints taken after [defendant's arrest] for the murder." In support of this contention, the post-conviction petition relies upon an affidavit submitted by defendant in which defendant avers that following his arrest for the offense at bar, he was "fingerprinted on three separate occasions." According to defendant's affidavit, he was first fingerprinted "immediately after my arrest *** [when] my right hand only was fingerprinted because of the injury to my left hand." Defendant avers in his affidavit that he was fingerprinted a second time "six or seven months following my arrest" when a "complete set of fingerprints, both right and left hands, was taken at the Cook County jail." Defendant further states in his affidavit that a third set of fingerprints was taken on November 22, 1989, when "palm

prints which included fingerprints were taken at the request of my attorneys."

As stated, at the motion to dismiss stage in post-conviction proceedings, all well-pleaded facts are taken as true unless positively rebutted by the record. *People v. Fair*, 193 Ill. 2d 256, 260 (2000); *Childress*, 191 Ill. 2d at 174; *Coleman*, 183 Ill. 2d at 385. After carefully examining the record in defendant's case, we find that the statement made by defendant in his affidavit that the first fingerprinting in connection with the offense at bar occurred "immediately after my arrest *** [when] my right hand only was fingerprinted because of the injury to my left hand" is contradicted by the record. During trial, Officer James Herman of the Schaumburg police department was called as a witness by the defense. Officer Herman testified that as part of the investigation of the murder, he took palm and fingerprints from the victim's roommate, Pamela Killeen, as well as the victim's neighbor, Kenneth Evenson. The following colloquy then occurred:

"Q. And did you have occasion to take the fingerprints and the fingertip prints from the defendant, William Peeples?

A. No, I did not.

Q. Did you take any prints of [defendant]?

A. Not at that time, no.

Q. At any time subsequent to that did you take [defendant's] fingerprints?

A. Not subsequent to that time, no."

Shortly after this testimony, counsel for both the prosecution and defense discussed the fingerprint evidence out of the presence of the jury in the judge's chambers. The transcript reveals that one of the prosecutors stated that at the time of his arrest, "defendant's hand was injured and could not be fingerprinted." This statement was corroborated by defense counsel, who stated that defendant's "injury was to one hand" and that "presumably at some point the next morning when he was in the police station

they could have fingerprinted the other hand, but they didn't." The trial court judge then stated that "evidently there was not a current fingerprint card taken at a [sic] close to the time of the incident because of injuries." The judge's statement was not disputed by either party. Therefore, we find that the specific statement in defendant's affidavit that he was fingerprinted "immediately" after his arrest is rebutted by the record.

With respect to the statement made by defendant in his affidavit that he was fingerprinted "six or seven months" after his arrest for the offenses at bar at Cook County jail, we find that there is no mention in the record of this occurrence. With respect to defendant's assertion that he was fingerprinted at the request of his attorneys on November 22, 1989, when "palm prints which included fingerprints" were taken, although we find reference in the record that "palm prints" were obtained from defendant at some time between his arrest and trial, the record is silent with respect to whether fingerprints were also taken on that occasion. Because the facts set forth with respect to these two specific statements do not appear on the face of the original record, they could have not been raised on defendant's direct appeal. We therefore address the merits of this specific post-conviction claim. *Whitehead*, 169 Ill. 2d at 372; *Eddmonds*, 143 Ill. 2d at 528.

A defendant is not entitled to an evidentiary hearing on his post-conviction claim as a matter of right. An evidentiary hearing is warranted only where the allegations of the post-conviction petition make a substantial showing that a defendant's constitutional rights have been violated. *Towns*, 182 Ill. 2d at 503. After carefully reviewing defendant's post-conviction claims and his affidavit, and taking all well-pleaded facts as true, we find that defendant has failed to make a substantial showing that there is a reasonable probability that he would not

have been convicted of first degree murder if fingerprint comparison evidence, using his post-arrest fingerprints and assuming that the comparison would again exclude defendant, had been introduced.

Defendant contends that the fingerprint comparison evidence is "exculpatory" and, had this evidence been disclosed to the jury, "they would have concluded that the unidentified prints found at the scene were left by the murderer" and not defendant. We disagree. The absence of defendant's fingerprints from the victim's apartment does not, as defendant contends, necessarily constitute "exculpatory" evidence which "exonerates" him from the crimes. Contrary to the argument advanced by defendant, the lack of his fingerprints at the crime scene does not establish that defendant was not in the apartment; instead, it may indicate that he either was careful not to leave fingerprints or that any fingerprints that were left were unsuitable for comparison. In addition, the recovery of latent prints from the victim's apartment which did not match the victim, Killeen, Evenson or defendant does not lead to the conclusion advocated by defendant that the prints were those of the "actual offender." To the contrary, the jury could have attributed many innocent explanations to the recovery of the fingerprints, including that they were left by visitors who had been invited into the apartment.

Considering the totality of circumstances presented to the jury, we conclude that defendant has failed to make a substantial showing that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different. The jury was presented with evidence that type A blood, the same blood type as defendant's, was recovered from the crime scene. The presence of a blood type other than that of the victim indicated that during the commission of the offenses, the perpetrator of the crime had suffered an

injury. The jury was also presented with evidence that defendant, who is left-handed, sustained severe lacerations to his left hand, which caused extensive bleeding. The jury was also informed that a knife recovered from defendant's home had traces of type AB blood, the blood type of the victim. In addition, type AB blood was discovered on defendant's wristwatch. We conclude that defendant has failed to make a substantial showing that a jury, presented with the above evidence, would have arrived at a different result had defense counsel introduced the fingerprint comparisons at trial. Therefore, defendant cannot establish that he was prejudiced by his attorneys' failure to present fingerprint comparison evidence. The circuit court correctly dismissed this specific post-conviction claim without an evidentiary hearing.

IV. Ineffective Assistance of Counsel During the
Aggravation-Mitigation Phase at Sentencing

Defendant next contends that he is entitled to an evidentiary hearing on his post-conviction claim that he was denied the effective assistance of counsel during the aggravation-mitigation phase of his capital sentencing hearing. Defendant premises his claim on the allegation made in his amended post-conviction petition that trial counsel ineffectively failed to investigate and present readily available mitigating evidence "which would allow the sentencer to understand how [defendant] came to the point where he stood convicted of a capital offense." To this end, defendant alleges in his amended petition that trial counsel's "failure to conduct a thorough investigation of their client's background and to present evidence regarding his childhood, social development, and neuropsychological impairment left the sentencing judge with an incomplete and misleading view of how [defendant] came to be before him." Defendant further alleges that counsel's case in mitigation, "which consisted of kind acts performed by [defendant] and an idealized,

unrealistic view of his childhood and family life, was completely irreconcilable with the crime of which he had been convicted." According to defendant, but for the alleged deficiencies in counsel's performance during the second stage of sentencing, there is a reasonable probability that defendant would not have been sentenced to death.

As stated, the standard for determining whether a defendant has received constitutionally deficient representation at a capital sentencing hearing is governed by the two-tier test enunciated in *Strickland*. The first prong of *Strickland* requires a defendant to show that the performance of counsel was deficient in that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Haynes*, 192 Ill. 2d at 473. In assessing whether the performance of counsel was deficient, judicial scrutiny of a defense counsel's performance is highly deferential; therefore, a defendant "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065, quoting *Michel*, 350 U.S. at 101, 100 L. Ed. at 93, 76 S. Ct. at 164; see also *Coleman*, 183 Ill. 2d at 397.

The second *Strickland* prong requires defendant to show that counsel's alleged-deficient performance prejudiced the defense. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. A defendant must show both deficiency and prejudice in order for a reviewing court to conclude that "the conviction or death sentence resulted from a

breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

In his amended post-conviction petition, defendant alleges that the performance of his trial counsel was deficient at sentencing because counsel had failed to conduct a thorough investigation with respect to potential mitigation evidence. In support of this allegation, defendant places substantial reliance upon an exchange which occurred between the trial court and defense counsel immediately before the start of the sentencing hearing. Our review of the trial record reveals that on the date the sentencing hearing was scheduled to begin, defense counsel requested that the trial court grant a continuance. Counsel explained that there "are certain aspects of mitigation we were still working on." Although counsel stated that they were still trying to locate additional potential mitigation witnesses, counsel reassured the court that they had been "preparing for this [sentencing] hearing diligently" and that they had "already talked to and interviewed [our] mitigation witnesses." Indeed, counsel informed the court that they had "four or five witnesses" at the courthouse who were ready to testify on behalf of defendant in mitigation.

It is apparent from the context of defense counsel's comments that the chief reason for requesting a continuance was because counsel, as a result of interviewing potential mitigation witnesses, had discovered information that "[defendant] was in a car accident a few years ago, and he also had spinal meningitis when he was younger which *** may have affected his brain." Counsel explained to the court that "what we are asking for is time to do a complete neurological workup on [defendant] for the brain to see if, just how his brain is, because there was spinal meningitis, and there was the car accident that he was involved in, where I believe he lost some

consciousness, and we spoke with a psychologist, Dr. Rosenwald, who thought that because of those factors that it might be appropriate to do the testing." Counsel stated that defendant had been examined by Dr. Rosenwald and that the doctor had suggested that an electroencephalogram (EEG) be performed on defendant. Counsel stated that although they had been diligently preparing for the aggravation-mitigation portion of the sentencing hearing, "there are some matters that inevitably arise in the last few days before such a hearing, and those are what you are hearing about now." The trial court judge denied defense counsel's motion for continuance and proceeded to the aggravation-mitigation stage of the sentencing proceedings.

In *Strickland*, the United States Supreme Court held that with respect to claims, such as that at bar, that counsel was ineffective as a result of a failure to investigate, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

Our review of the trial record, as well as the materials submitted by defendant in support of his post-conviction petition, leads us to conclude that defendant has failed to make a substantial showing in support of his allegation that his trial counsel was deficient in failing to reasonably investigate defendant's family and social background. In his amended post-conviction petition, defendant asserts that although his trial counsel

"did offer testimony of family members regarding [defendant's] redeeming qualities," counsel was nevertheless deficient in "failing to offer any evidence concerning [defendant's] background which shed light on any of the criminal conduct of which he has been accused and convicted." Defendant alleges in his amended petition that counsel was deficient in that "the only witness counsel asked to describe anything about [defendant's] development was [defendant's] mother," and that the information she provided was "incomplete, and, in many respects, inaccurate." Defendant asserts that had counsel interviewed additional family members and examined defendant's records, they would have learned that defendant's mother "had mental problems, lived a chaotic lifestyle, frequently left [defendant] to the care of others, and, consequently, was not the best historian of [defendant's] life." According to defendant, counsel's failure to conduct a thorough investigation of defendant's background "left the sentencing judge with an incomplete and misleading view of how [defendant] came to be before him."

The trial record reveals that defense counsel had contacted the two closest members of defendant's family, his mother and sister, had traveled to their residence, and had interviewed them, face to face, for several hours. As a result of this investigation, counsel were provided with information with respect to defendant's family and social history, including information that defendant had spinal meningitis as a child and was involved in a car accident causing him to lose consciousness. Further, the investigation provided counsel with several additional names of potential mitigation witnesses, and counsel stated to the trial court judge that "we have been in contact with these witnesses," that counsel had issued subpoenas, and that they had hired an investigator to follow up on potential leads.

The trial record further reveals that, during the mitigation portion of the sentencing proceedings, counsel called six witnesses to testify on behalf of defendant, four of whom were members of defendant's family. In addition, counsel submitted two letters written in support of defendant. The information elicited from the witnesses during the mitigation portion of the hearing by defense counsel showed that despite experiencing a very troubled childhood, and despite facing adversity while growing up, defendant possessed "the strength and inner goodness to become what we consider a good son, a good brother, good uncle, and a father figure to his sister." The record shows that defense counsel made a strategic choice to argue that there were "two William Peeples. The William Peeples that family and friends knew and the William Peeples that the jury convicted of murder." In pursuing this mitigation strategy, defense counsel focused on the redeeming qualities possessed by defendant and asked the judge to view defendant as a person whose life was worth saving and who was worthy of mercy. Counsel focused upon defendant's "love of his family, his taking care of his family," and stated this defendant's being alive "even if it is in prison, sustains and supports his mother and sister, and his niece." In addition, we note that defendant in allocution repeated this theme to the extent that, after denying he committed the crimes of which he was convicted and that he therefore had no remorse, stated that "I love my family and my friends and I tried to love my fellow human beings." Indeed, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; see also *People v. Enis*, 194 Ill. 2d 361, 409-10 (2000); *People v. Evans*, 186 Ill. 2d 83, 96 (1999). Further, the fact that the sentencer did not accept defense counsel's position does not mean

that defense counsel was ineffective. *People v. Franklin*, 135 Ill. 2d 78, 119 (1990).

In sum, affording the appropriate deference to counsel's performance, we conclude that counsel's choice of strategy was "well within the range of professionally reasonable judgments" (*Strickland*, 466 U.S. at 699, 80 L. Ed. 2d at 701, 104 S. Ct. at 2070), and that the decision of counsel not to seek family and social background evidence in addition to that which was already in hand was also reasonable.

In his amended post-conviction petition, defendant contends that his trial counsel were deficient during the aggravation-mitigation portion of the sentencing hearing in a second respect. Defendant alleges that counsel failed to reasonably investigate and present any evidence in mitigation with respect to defendant's "longstanding cognitive deficits particularly in those portions of the brain associated with reasoning, judgment and initiating and inhibiting behavior." As stated, courts are highly deferential in reviewing counsel's strategic decisions regarding the presentation of mitigation evidence. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065; *Towns*, 182 Ill. 2d at 513-14. However, such deference is not warranted where the lack of mitigating evidence presented is not a result of strategy, but rather is attributable to counsel's failure to properly investigate mitigation and prepare a defense. *Towns*, 182 Ill. 2d at 514; *People v. Howery*, 178 Ill. 2d 1, 56 (1997). Accordingly, counsel's presentation of mitigation is not deemed to be a legitimate strategy without a reasonable investigation into mitigating circumstances. *Towns*, 182 Ill. 2d at 514.

We conclude that defendant has made a substantial showing that defense counsel's failure to present evidence with respect to defendant's alleged cognitive deficits during the mitigation portion of the sentencing hearing was

not the result of a strategic decision preceded by a reasonable investigation. The record before this court indicates that immediately prior to the start of the aggravation-mitigation stage of the sentencing hearing, counsel requested that the trial court grant a continuance because, as a result of the interviews with mitigation witnesses, counsel had discovered information that defendant had suffered from spinal meningitis as a child and had been in a car accident, two events which "may have affected his brain." Counsel asked the court for "time to do a complete neurological workup" on defendant, including an EEG, which was recommended by Dr. Rosenwald. The trial court judge denied defense counsel's motion for continuance, and counsel did not introduce evidence concerning defendant's alleged cognitive deficits during their mitigation case.

It is well established that " '[m]itigating evidence is extremely important under the Illinois capital sentencing scheme,' " because " '[o]nce an aggravating factor is found sufficient to impose the death penalty, there must be mitigating evidence sufficient to preclude the imposition of the death penalty.' " *Morgan*, 187 Ill. 2d at 541, quoting *People v. Perez*, 148 Ill. 2d 168, 194 (1992). Given the critical importance of mitigation evidence, defense counsel has a duty to make a reasonable investigation for potential sources of such evidence, or must have a legitimate reason for failing to make a particular investigation. *Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *People v. Enis*, 194 Ill. 2d 361, 402 (2000); *Morgan*, 187 Ill. 2d at 541. Given the record before us, we conclude that counsel's failure to introduce this evidence is attributable to their failure to properly investigate this potential mitigation evidence and prepare a defense. Accordingly, we find that defense counsel's failure to investigate and present evidence of defendant's alleged cognitive deficits was deficient.

However, "[a]n error by counsel, even if profession-
ally unreasonable, does not warrant setting aside the
judgment of a criminal proceeding if the error had no ef-
fect on the judgment." *Strickland*, 466 U.S. at 691, 80 L.
Ed. 2d at 696, 104 S. Ct. at 2066. Under the second prong
of *Strickland*, a defendant must demonstrate that there
is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would
have been different. *Strickland*, 466 U.S. at 694, 80 L.
Ed. 2d at 698, 104 S. Ct. at 2068. In the specific context
of an allegation that trial counsel was ineffective for fail-
ing to investigate and present mitigation evidence,
defendant must show that there is a reasonable prob-
ability that, absent the errors committed by counsel, the
finder of fact " 'would have concluded that the balance of
aggravating and mitigating circumstances did not war-
rant death.' " *People v. Henderson*, 171 Ill. 2d 124, 145
(1996), quoting *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d
at 698, 104 S. Ct. at 2069.

Our careful examination of the record leads us to
conclude that defendant has failed to satisfy the prejudice
prong of *Strickland*. Under *Strickland*, it is "not enough
for the defendant to show that the errors had some
conceivable effect on the outcome of the proceeding."
*Strickland*, 466 U.S. at 693, 80 L. Ed. 2d at 697, 104 S.
Ct. at 2067. Defendant has failed to make a substantial
showing that the evidence that he contends trial counsel
should have offered at the sentencing hearing creates a
reasonable probability that the sentencer would have
concluded that the balance of aggravating and mitigating
circumstances did not warrant death.

Defendant first argues that he was prejudiced by
counsel's failure to present evidence of defendant's cogni-
tive impairments during the mitigation stage of the
sentencing proceedings. Defendant contends that evi-
dence of these impairments would have assisted in

explaining the aggravating evidence presented by the State and that, under this court's decision in *People v. Morgan*, 187 Ill. 2d 500 (1999), the prejudice is apparent. Defendant concludes that because the facts at bar are "remarkably similar" to those in *Morgan*, this court must find that the circuit court erred in dismissing defendant's claim without an evidentiary hearing. We disagree and find that defendant's reliance upon *Morgan* is misplaced.

In *Morgan*, the circuit court conducted an evidentiary hearing on the defendant's post-conviction claim that his trial counsel was ineffective at the sentencing phase of his trial because counsel failed to investigate and present mitigating evidence of the defendant's lifelong organic brain damage. During the hearing, a neurologist testified that the defendant suffered from severe bilateral dysfunction of the frontal lobes of the brain, as well as from more diffused damage to other portions of the brain. This frontal lobe damage caused the defendant to be "short tempered" and "unable to check his impulses." In addition, the defendant's expert stated that there was a direct connection between the organic damage to the defendant's brain and the conduct described as part of the State's case in aggravation during the death penalty hearing. According to the defendant's expert, the violent manner in which the defendant carried out the two murders with which he was charged "was characteristic of defendant's frontal lobe damage, revealing 'stimulus-bound' behavior and 'excessive paranoia,' " and that the "defendant would not have conducted himself the way he did at the time of the offenses had the frontal lobes of his brain not been damaged." *Morgan*, 187 Ill. 2d at 553-54. Significantly, the defendant's expert concluded that the defendant's brain damage was the " 'determining factor' " in his behavior at the time of the murders. *Morgan*, 187 Ill. 2d at 553. In addition, a clinical

psychologist testified during the evidentiary hearing that the severity of defendant's brain damage caused him to suffer from " 'paranoid ideation' " which, at the time of the offenses, led the defendant to " 'misconstrue' " the actions of the victims and to react in an " 'irrational' " manner. *Morgan*, 187 Ill. 2d at 554.

This court in *Morgan* held that in light of the minimal amount of evidence presented by the defendant's trial counsel during the mitigation portion of the sentencing hearing (which comprised 10 pages of transcript), the failure of defense counsel to present evidence of the defendant's severe organic brain damage which was linked by two experts to the defendant's brutal actions at the time of the murders prejudiced defendant. *Morgan*, 187 Ill. 2d at 556-57. Accordingly, this court vacated defendant's death sentence and remanded his cause to the circuit court for a new sentencing hearing.

In the case at bar, the nature of the evidence presented in support of defendant's amended petition with respect to his "cognitive deficits" stands in sharp contrast to the evidence adduced with respect to the defendant's lifelong severe organic brain damage in *Morgan*. The neuropsychological evaluation prepared by Dr. Gelbort in support of defendant's amended petition characterized defendant's "brain dysfunction" as "minimal," and explained that as a result of this dysfunction, defendant's "ability to think in a logical, goal directed manner" is impacted. Dr. Gelbort opined that, due to defendant's brain dysfunction, defendant's "[j]udgement, problem solving, and reasoning are affected and impaired," that defendant's "everyday activities and ability to plan ahead" are adversely affected, and that defendant's brain impairment "would almost certainly have been present at the time of the offense." The nature of the evidence presented by defendant at bar with respect to his brain dysfunction does not equate

with the nature of the evidence adduced in *Morgan*, where two medical experts "testified that there was a definite link between the physical damage to defendant's brain and defendant's criminal conduct," to the extent that the defendant's brain damage was the " 'determining factor' " in his behavior at the time of the murders. *Morgan*, 187 Ill. 2d at 553-55. Therefore, defendant's reliance upon *Morgan* is inapposite.

Under *Strickland*, in evaluating whether a defendant has been prejudiced by the failure of counsel to present certain evidence to the sentencer, it is appropriate to consider the strength of the proffered mitigating evidence and whether the "admission of the evidence [defendant] now offers might even have been harmful to his case." *Strickland*, 466 U.S. at 700, 80 L. Ed. 2d at 701, 104 S. Ct. at 2071. Indeed, this court has repeatedly explained that "[a]t sentencing, a judge or jury considering evidence of this nature [mental deficits] might view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness." *People v. Tenner*, 175 Ill. 2d 372, 382 (1997); see also *People v. Evans*, 186 Ill. 2d 83, 102 (1999) ("Proof of defendant's mental handicaps not only could evoke compassion from the trial judge, but also could have demonstrated defendant's continued dangerousness"); *People v. Franklin*, 167 Ill. 2d 1, 27 (1995) ("the evidence of defendant's mental illness may also have shown that defendant was less deterrable or that society needed to be protected from him"); *People v. Mahaffey*, 165 Ill. 2d 445, 467-68 (1995) (" 'On the one hand, [evidence of mental impairment] shows the defendant to be less culpable; on the other, it shows the defendant to be less deterrable. *** Jurors who see capital punishment as the just [dessert] of the wicked will be swayed in favor of lenience; jurors with more

instrumental views will incline toward execution as the only way to incapacitate such a person' ''), quoting *Brewer v. Aiken*, 935 F.2d 850, 861 (7th Cir. 1991) (Easterbrook, J., concurring); *People v. Henderson*, 142 Ill. 2d 258, 340 (1990). Indeed, admission of the evidence defendant now offers contained within Dr. Gelbort's report may have been harmful to defendant's case. In his report, Dr. Gelbort stated that academic achievement testing found defendant's reading and spelling to be at the high school level. In addition, based upon his examination of defendant, Dr. Gelbort found that defendant's "recollection of past events tends to 'normalize' his experience" to the extent that defendant "minimized or denied" many of the problems he experienced during his lifetime. We find that, in the matter at bar, had the sentencer heard the proffered evidence of defendant's cognitive impairments, in addition to his history of violence, the sentencer could have reasonably concluded that this evidence demonstrated defendant's future dangerousness. Accordingly, we agree with the ruling of the post-conviction court and conclude that defendant has failed to make a substantial showing that there is a reasonable probability that, had the sentencer heard the now-proffered evidence of defendant's cognitive impairments, the result of the proceeding would have been different.

Defendant also asserts that he was prejudiced by counsel's failure to present evidence of defendant's troubled family and social background during the mitigation stage of the sentencing proceedings. However, we have found that counsel's performance with respect to investigating and presenting evidence of defendant's family and social background was not deficient under *Strickland*. Although that finding alone is sufficient to defeat defendant's ineffective assistance of counsel claim on this specific issue (*Strickland*, 466 U.S. at 687, 80 L. Ed.

2d at 693, 104 S. Ct. at 2064), we additionally find that counsel's failure to introduce the evidence now cited by defendant with respect to his difficult upbringing did not result in prejudice. This court has repeatedly explained that although evidence with respect to a defendant's chaotic childhood or family history of violence "could have evoked compassion in the jurors, it could have also demonstrated defendant's potential for future dangerousness and the basis for defendant's past criminal acts." *Franklin*, 167 Ill. 2d at 27; see also *Enis*, 194 Ill. 2d at 412; *Childress*, 191 Ill. 2d at 179; *People v. Evans*, 186 Ill. 2d at 101; *People v. Sanchez*, 169 Ill. 2d 472, 491-92 (1996). This is also true with respect to evidence of educational disabilities. *Easley*, 192 Ill. 2d at 341; *People v. Johnson*, 183 Ill. 2d 176, 203-04 (1998).

In the matter at bar, the sentencer could have reasonably concluded that much of the evidence defendant now seeks to introduce is, in fact, harmful to defendant's case. Many of the documents submitted by defendant in support of his amended petition contain highly damaging evidence. For example, the evidence reveals that, throughout his life, defendant had a quick and violent temper, and that this violence animated his relationships with his family, friends, and, most especially, with women. In her mitigation report, mitigation specialist Caryn Platt Tatelli stated that within defendant's family there exists a "generational pattern, and acceptance of, violence, temper expressed in rage, and aggression," and that defendant's family "utilized violence and force as a means of solving and reconciling their differences with others." According to Tatelli's report, defendant and his sister fought "passionately" with each other, and such fights included "indiscriminate violence." Defendant also fought with his fiancée, Vanessa Allen, and sometimes those fights also became physical. Tatelli further stated in her report that after the family moved to the suburbs,

defendant engaged in a series of romantic relationships, "all of which [had] underpinnings of violence," that the "reports of inter-relationship violence corroborate other reports made of [defendant's] temper," and that "[m]any, if not all of the sources indicated that [defendant] has an extremely hot and volatile temper." Tatelli described defendant as "rapidly reach[ing] a boiling point, or a level of explosiveness which could not be controlled." Tatelli concluded her report by stating that "[a]s a result of the forces acting upon [defendant], he began to turn the naturally-occurring anger, frustration and hatred for his life situation inward, upon himself, allowing it to build into a horrible temper, as was the method of his family *** and began to harbor a deep-seated rage." We agree with the post-conviction judge's conclusion that this is powerful evidence of defendant's future dangerousness.

In addition, the evidence submitted by defendant in support of his amended post-conviction petition reveals that defendant has a history of setting fires and using knives in the course of his violent and angry outbursts. According to Tatelli's report, defendant cut up the furniture in his home with a knife and often set fires. On one occasion, defendant started a fire in the basement of the family home. Tatelli stated that defendant's family members believed that defendant's conduct in starting the fire was an example of defendant "constantly doing what he had been told not to do." The sentencer could have reasonably viewed this evidence as harmful to defendant, to the extent that it shows that defendant's past conduct is consistent with his conduct in the matter at bar: using a knife to inflict multiple stab wounds to the victim and setting fires to dispose of evidence.

Other evidence contained within the documents submitted in support of defendant's amended post-conviction petition is cumulative or duplicative to the

evidence which was already presented by defense counsel during the mitigation phase of sentencing. For example, a substantial amount of the proffered evidence describes defendant's chaotic upbringing, the fact that defendant's mother engaged in a series of relationships, and that defendant had difficulties in school. During the mitigation portion of the sentencing hearing, defense counsel called six witness who testified, *inter alia*, that defendant's family life was very unstable, that he was shuttled from caregiver to caregiver, that defendant's mother had a series of unsuccessful relationships and suffered from debilitating health problems, that he did not have a positive male role model in his life, that he had been exposed to alcohol and drugs at an early age, and that defendant had experienced trouble at school and had lived in environments not conducive to peaceful living. In addition, defense counsel presented evidence during mitigation that defendant had been subjected to physical and psychological abuse as a child and that defendant had observed psychological, physical and sexual abuse within his family. Although defendant now alleges that counsel's case in mitigation "consisted of kind acts performed by [defendant] and an idealized, unrealistic view of his childhood and family life," our review of the record shows that the nature of the evidence presented during mitigation by defense counsel belies defendant's contention and reveals that evidence of the same nature now proffered by defendant was already before the sentencer.

Defendant nevertheless contends that the evidence submitted in his post-conviction petition is at least as mitigating as the evidence in our prior decisions found to satisfy the prejudice prong of *Strickland*. Defendant's reliance on these cases, however, is misplaced. The decisions cited by defendant are factually distinguishable from the matter at bar, for, in those cases, defense counsel presented very little or no evidence during the mitigation

phase of the death sentencing hearing. *E.g.*, *Towns*, 182 Ill. 2d at 507 (defense counsel presented four witnesses in mitigation whose testimony accounted for only 10 pages of trial transcript); *People v. Orange*, 168 Ill. 2d 138, 166 (1995) (no mitigation witnesses were presented by trial counsel); *People v. Thompkins*, 161 Ill. 2d 148, 165 (1994) (defendant's wife was the sole mitigation witness); *People v. Perez*, 148 Ill. 2d 168, 176-77 (1992) (the sole evidence presented in mitigation was a psychological report prepared by the Department of Corrections during the defendant's incarceration for a prior offense); *People v. Ruiz*, 132 Ill. 2d 1, 21-22 (1989) (the only mitigation witness called by defense counsel was a police officer who testified that defendant expressed remorse during questioning). In contrast, defense counsel at bar presented the testimony of six witnesses on defendant's behalf in mitigation, and submitted into evidence two letters written on defendant's behalf. In addition, defendant gave his own statement in allocution. The sentencer, therefore, was presented with evidence and argument in several areas of mitigation absent from the decisions relied upon by defendant.

In sum, defendant has failed to make a substantial showing that there is a reasonable probability that, had his trial counsel presented the evidence now proffered in support of his amended post-conviction petition, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant the imposition of the death penalty. This court must "assess prejudice in a realistic manner based on the totality of the evidence," and therefore "it is improper to focus solely on the potential mitigating evidence *** [as] the nature and extent of the evidence in aggravation must also be considered." *Coleman*, 168 Ill. 2d at 538.

In this case, the aggravation evidence is plentiful and significant. Defendant's prior criminal convictions

include offenses in which he wielded a knife against his victims. Defendant pled guilty to the charge of misdemeanor battery when he was apprehended during an altercation in which he was found in the possession of a knife and the other party had been stabbed in the back. At the time of his arrest, defendant was on mandatory supervised release and, because he was found in possession of a knife, he was returned to the penitentiary for violating his parole. Defendant was on mandatory supervised release after serving a period of incarceration as a result of his conviction of residential burglary and the attempted rape of a 13-year-old girl, where he used a ruse to gain entry into the victim's home and threatened to kill the victim with a knife if she did not acquiesce to his demands. Defendant's conduct in that case is strikingly similar to his conduct in the case at bar, where defendant apparently gained entry into the apartment of Dawn Dudovic by asking her for a cup of sugar and then stabbing her to death with a knife. Moreover, the circumstances surrounding the murder of Dawn Dudovic are particularly violent. Defendant stabbed the victim 23 times and inflicted 16 incised wounds. The victim exhibited numerous defense wounds to her arms and hands, indicating that there was a prolonged struggle. The victim died as a result of these multiple stab wounds, three of which completely pierced her lung, liver and heart.

We conclude that, given all of the evidence before the sentencer, defendant has failed to make a substantial showing that there is a reasonable probability that the additional evidence now offered by defendant would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, therefore, the sentence imposed. Accordingly, we hold that defendant has failed to make a substantial showing that his right to effective assistance of counsel at his

sentencing hearing was violated. The circuit court correctly dismissed this post-conviction claim without an evidentiary hearing.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Cook County dismissing defendant's amended post-conviction petition is affirmed. The clerk of this court is directed to enter an order setting Tuesday, November 19, 2002, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 2000). The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

The proceedings which culminated in Peeples' convictions and sentence of death were fatally flawed because they did not comport with the new rules enacted by our court governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in *People v. Hickey*, 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us. Because Peeples was tried, convicted and sentenced without the benefit of the new rules, his convictions and death sentence should be vacated, and the cause should be remanded to the circuit court for a new trial.

Even if Peeples were not entitled to the benefit of the new rules, his sentence of death could not stand. For the reasons set forth in my partial concurrence and partial

dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Absent the new rules, there is no basis for altering that conclusion. At a minimum, Peeples' sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. Ill. Rev. Stat. 1987, ch. 38, par. 9—1(j).

JUSTICE KILBRIDE, also dissenting:

For the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I believe this cause should be remanded for a new trial conducted in compliance with the new rules governing capital cases. As I stated in my dissents, the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. For this reason, I believe that the new rules should be applied retroactively. See *People v. Caballero*, 179 Ill. 2d 205, 220-21 (1997). Therefore, I respectfully dissent.